1

1          UNITED STATES DISTRICT COURT
           EASTERN DISTRICT OF NEW YORK
2

3    - - - - - - - - - - - -    X

4    ORDER REQUIRING APPLE INC

5    TO ASSIST IN THE EXECUTION

6    OF A SEARCH WARRANT

7    ISSUED BY THE COURT, ET AL

8
                                    15 MC 1902
9    - - - - - - - - - - - - - X

10                                  United States Courthouse

11                                  Brooklyn, New York

12                                  October 26, 2015
                                    11:30 o'clock a.m.
13

14               TRANSCRIPT OF ARGUMENT
           BEFORE THE HONORABLE JAMES ORENSTEIN
15            UNITED STATES MAGISTRATE JUDGE

16   APPEARANCES:

17   For the Government:        ROBERT L. CAPERS
                                United States Attorney
18                              271 Cadman Plaza East
                                Brooklyn, NY 11201
19
                                BY: SARITHA KOMATIREDDY
20                                  LAUREN H. ELBERT
                                    AMEET KABRAWALA
21                                  Assistant US Attorneys

22
     For Apple:                 ZwillGen
23                              1900 M Street NW
                                Washington, DC 20036
24
                                BY: MARC J. ZWILLINGER, ESQ.
25                                  JEFFREY LANDIS, ESQ.

                 GR    OCR    CM    CRR    CSR

```
 1   Court Reporter:                 Gene Rudolph
                                     225 Cadman Plaza East
 2                                   Brooklyn, New York
                                     (718) 613-2538
 3

 4   Proceedings recorded by mechanical stenography, transcript
     produced by computer-aided transcription.
 5

 6

 7                         * * * * * * *

 8

 9              THE CLERK:  Civil cause for oral argument,

10   15 Miscellaneous 1902, In Re Order Requiring Apple Inc to

11   Assist in the Execution of a Search Warrant.

12              THE COURT:  Good morning.

13              May we have the appearances, please?  For the

14   government?

15              MS. KOMATIREDDY:  Good morning, Your Honor.

16              Saritha Komatireddy for the United States.  I am

17   joined by Lauren Elbert and Ameet Kabrawala, both Assistant

18   United States Attorneys.

19              THE COURT:  Welcome to all of you.

20              MR. ZWILLINGER:  Good morning, Your Honor.

21              Marc Zwillinger for Apple.  I am joined at counsel

22   table with my colleague Jeffrey Landis.

23              THE COURT:  Good morning to both of you.

24              All right, folks.  First I want to thank you all for

25   the briefing that you have provided, very informative, very
```

1  helpful.  I know it has been on a somewhat quick schedule, so

2  I appreciate that.  It's really helped me get a handle on some

3  of these issues and also made it clear to me how very close

4  some of them are, to my mind.

5         I will have some questions for both sides as we go

6  along but I do want to hear from you.  As we get started

7  though I want to bring to your attention something that one of

8  my colleagues alerted me to because I do intend to ask about

9  it.  I will ask my deputy to hand a copy down.

10        It is a letter from the government and some

11  testimony in a hearing before Judge Johnson in a case in this

12  district.  The letter is dated July 9, 2015, and the testimony

13  was taken on September 3rd of this year in United States

14  against Djibo.

15        I bring it to your attention because the basic

16  assertion on the part of the government that brings us here is

17  the proposition that the iPhone at issue here is one that the

18  DEA and FBI have tried and failed to unlock because of the

19  pass code and the government expands from that in its brief to

20  say that the government, broadly speaking I suppose, is simply

21  unable to unlock the phone at issue here.

22        So the reason I bring the Djibo materials to your

23  attention is because on page five of the letter the government

24  writes, HSI, Homeland -- Department of Homeland Security -- I

25  always forget what the I stands for.  In any event, HSI is in

4

1    possession of technology that would allow its forensic

2    technicians to override the pass codes security feature on the

3    subject iPhone and obtain the data contained therein.

4            In other words, even if HSI agents did not have the

5    defendant's pass code, they would nevertheless have been able

6    to obtain the records stored in the subject iPhone using

7    specialized software.  The software works to bypass the

8    bi-code entry requirement and unlock the cellular telephone

9    without having to enter the code.  Once the device is

10   unlocked, all records in it can be accessed and copied.

11           Then in the testimony in the Djibo case the

12   government's forensic expert expanded on that and explained

13   something about how it works, including under

14   cross-examination by the defendant's counsel in that case, and

15   made clear that the software version in that case was

16   running -- the iPhone in that case was running, the software

17   version of IOS 8.1.2, if I am not mistaken.

18           I am giving this to you now.  I learned of it since

19   your briefing.  If you have some thoughts on it I am happy to

20   hear it but I don't want to put you on the spot.  I want you

21   to know that this has come to my attention and I'll, of

22   course, afford both sides here an opportunity to submit

23   something further on it if they like.

24           That's where I am starting from.  I am going to have

25   a number of questions, I'm sure.  But Ms. Komatireddy, or one

5

1  of your colleagues, or whoever wants to be heard, why don't

2  you start.

3          MS. KOMATIREDDY:  Thank you, Your Honor.

4          We would like to make some introductory remarks and

5  of course we are happy to answer any questions the Court may

6  have.

7          THE COURT:  Yes.

8          MS. KOMATIREDDY:  In this case, the most important

9  thing to remember is that a federal court issued a federal

10  search warrant commanding agents to search a phone for

11  evidence of crime, a crystal meth conspiracy.

12          THE COURT:  The search warrant has expired over a

13  year ago, correct?

14          MS. KOMATIREDDY:  There were two search warrants

15  issued.  There was one search warrant issued in 2014.

16          THE COURT:  That is the one attached to the

17  application.

18          MS. KOMATIREDDY:  No, sir.  The first search warrant

19  was for the home and the devices.

20          THE COURT:  No.  I am talking about the one attached

21  to the application now before me.

22          MS. KOMATIREDDY:  Yes.

23          THE COURT:  I should note, by the way, the

24  application said it is attached as Exhibit A.  It is not on

25  the docket.  It should be.  I will ask you to correct that.

6

1    But it was attached to the email by which I initially got the

2    application.

3              Anyway, that warrant has expired over a year ago,

4    hasn't it?

5              MS. KOMATIREDDY:  The warrant was issued July 6th.

6    It has to be executed within two weeks of the issuance date.

7    With electronic evidence you can initiate the execution of the

8    search warrant by attempting to search the device, turning it

9    on and placing it in airplane mode.  The agents here began

10   that search but were unable to complete that search because of

11   the password bypass.

12             THE COURT:  So you are saying it's already started

13   and you can finish it at any time?

14             MS. KOMATIREDDY:  Yes, sir.

15             THE COURT:  I am not sure I agree with that.  I

16   don't think it matters a bit.  Even if it expired, I would

17   assume that you are making a request for a renewed warrant.

18             But it does raise the question, why is it the

19   government waited from July of 2014 until October of 2015 to

20   ask Apple for this assistance as recounted in your brief only

21   then to tell me that you need me to issue an expedited

22   decision.

23             MS. KOMATIREDDY:  Fair enough, Your Honor.

24             The government, as noted in the brief, there are two

25   agencies involved in this case, the DEA and the FBI.  The DEA

1    first primarily attempted to enter into the phone using its

2    own technology.  After being unable to do so, it consulted

3    with the FBI.

4           I want to note that there were ten cellphones seized

5    from the defendant's home.  That search warrant at issue on

6    July 6th was for all ten cellphones.  They were in the process

7    of executing a search warrant on the other phones.  That took

8    some time.  It also took some time for the government to

9    explore the reasonable alternatives available to it in order

10   to execute the search warrant without having asking for

11   third-party assistance.

12          Once it determined, both agencies determined that

13   they could not get into the phone without Apple's assistance,

14   the government reached out to Apple.  I do think it's

15   important to note the government reached out to Apple first

16   before ever applying for any relief in this Court and asked if

17   it could bypass the pass code and do so within time for trial.

18   Apple stated that it could and would with a Court order and

19   stated that it would do within one to two weeks.  To

20   accommodate the revised schedule here in the briefing, Apple

21   now stated it can actually do it in one day.  That's the

22   turnaround time we now expect.

23          In that process of those conversations, Apple

24   provided the government with specific language from its legal

25   process guidelines that it required, that it insisted on,

1    requested for what it would consider an order that it could

2    follow in executing the government's request for assistance.

3    When the government applied to this Court for and order, it

4    used that language.

5          Now, this was a textbook example of Apple's

6    long-standing and responsible corporate practice of bypassing

7    locked cellphones when it has a Court order requiring it to do

8    so.

9          Since 2008, our initial estimates are that Apple has

10   received at least 70 court orders requiring it to assist in

11   this manner, has never objected to them and has complied.  I'm

12   sure counsel for Apple has the exact number available for you.

13   That number is based on an initial survey, an ongoing query of

14   government prosecutors around the country.

15         THE COURT:  I take it, that fact, you are not

16   saying, I don't think you are saying, that it constitutes any

17   sort of waiver.  It's really just a question of burden.

18         MS. KOMATIREDDY:  That is correct.  It's not a

19   waiver per se.

20         It's worth noting that Apple in that process since

21   2008, and we quoted the very first email we have on record,

22   where Apple provided this guidance, throughout that time

23   period it had an established procedure for routinely taking in

24   these requests, complying with them, processing them and

25   informing the public about this practice by continually

1  publishing and updating its legal process guidelines.

2         During that same timeframe that it has been

3  processing these requests Apple has grown to become the

4  biggest company in the world.  So plainly any burden in terms

5  of employee resources or time or reputation was minimal.

6         The government's application in this case followed

7  that same template, that same routine procedure.  It was not

8  secret.  It was not new.  It did not invoke any new legal

9  authority.  It did not seek any new broad surveillance

10  authority.  It did not ask Apple to create any capability that

11  it did not already have.  It was just a simple routine request

12  for assistance in carrying out a valid search warrant issued

13  by a federal court, as Apple has done so many times before.

14         For years Apple has provided this assistance and

15  until two weeks ago Apple indicated to the government that it

16  would provide that assistance again in this case.  Apple's

17  position in Court today represents what we consider to be a

18  stunning reversal of that position, and Apple's stated reason

19  for this reversal is a concern for its brand.  This is

20  unfortunate.  American consumers should expect that American

21  companies protect their privacy and their safety.

22         THE COURT:  Your brief goes to a surprising length

23  to questioning the patriotism of a company that stands on its

24  rights in this way.  Whether I agree or disagree with it

25  really doesn't help me resolve the legal issue.  But it does

1    create an atmosphere I think that, it isn't helpful.  You

2    don't think they are patriotic to question.  You have made

3    that clear in your brief.  I'd really just as soon focus on

4    the legal question.

5              MS. KOMATIREDDY:  It's not a question of patriotism,

6    Your Honor.  It's a suggestion, Apple states in its brief that

7    it is happy to -- it takes seriously its responsibility of

8    assisting where there is legal access, there is a legal form

9    of access to data, and it takes a stand against improper

10   access.  There is no improper access here.  There is a valid

11   federal search warrant.

12             Of course, we welcome this debate and we welcome the

13   opportunity to explore these issues but we are a little bit

14   surprised only because in this case -- Apple has for a long

15   time complied with lawful Court orders requiring and

16   requesting exactly what we are requesting in this case.

17             THE COURT:  I take it -- forgive me for

18   interrupting.  I take it, there is no question that, leaving

19   aside any possibility of an appeal to the higher court, if the

20   end result of this case is a court order that Apple must do

21   what the government seeks, Apple is going to comply here,

22   right?

23             MR. ZWILLINGER:  That is correct, Your Honor.  Apple

24   would comply with an order of this court.

25             THE COURT:  Okay.  That's why I am not sure I

1   understand.  You are not saying that there is some sort of

2   waiver or estoppel based on past practice.  I am not sure that

3   what Apple has done before goes to anything other than giving

4   some insight into the burden.

5          MS. KOMATIREDDY:  That's exactly right, Your Honor.

6          THE COURT:  I get that.

7          MS. KOMATIREDDY:  I want to add one more point, Your

8   Honor, which is the comment on what American consumers expect

9   for the company.  It's not a comment about patriotism.  It's a

10  comment on what Apple has perceived as damage to their brand.

11  This Court shouldn't condone the notion that a company has a

12  negative impact on its brand when it follows US law or that --

13         THE COURT:  It is such a tendentious way of putting

14  things.  It's just not going to help me.

15         Look, there is a wonderful argument to be made, as

16  you make it, that Americans expect that corporate citizens

17  will comply with law.  Apple will do so here.  There is no

18  question about it.

19         But there is a competing interest that they have

20  identified and, I take it, you would acknowledge that any

21  private entity called on to be pressed into service by the

22  government is in the best position to identify what its

23  interests are, whether or not they should give way to them.

24  They are in the best position to tell us, here is what we

25  value, here is what is important to us.  You may say well,

1    that's not a good value.  We don't think Americans share that

2    value, all right thinking Americans at least.

3              How does it help me understand the legal issue here?

4              MS. KOMATIREDDY:  It is a comment on the burden,

5    Your Honor.  Our position is, it doesn't actually damage the

6    brand.  There is not actually a burden in terms of

7    reputational burden.

8              THE COURT:  Is that based on any kind of data, any

9    evidence or is it just -- it can't be that people won't

10   appreciate it if Apple complies with the law and helps you

11   promote an investigation.

12             MS. KOMATIREDDY:  It's based on a couple of things.

13   First, in the last seven years Apple has published its

14   practice of complying with these sorts of orders, providing

15   assistance to law enforcement to get into locked phones when

16   there are valid search orders.  That practice has been public.

17   It's reasonable to assume that customers have been aware of

18   that.  Even a cursory search of Apple support blogs or

19   discussion forums --

20             THE COURT:  So why did the government announce that

21   it's not seeking to seek backdoor legislation?

22             MS. KOMATIREDDY:  That is a separate issue.  Here,

23   this is not a backdoor.

24             THE COURT:  It's not a backdoor.  It's the same

25   basic idea, which is the government for reasons sufficient to

1   itself -- this is another reason why I don't think it is

2   useful to have the conversation about whose values are better.

3   But the government announced a decision, surprisingly unknown

4   to me, on the same day that this application was made that

5   they are not going to seek authority from Congress to require

6   a company like Apple to provide access that gets past password

7   or encryption.

8          If you are saying that look, all right thinking

9   Americans are going to want a company like Apple to do just

10  that, I don't understand why the government would balk at

11  asking Congress to require it.

12         But it doesn't matter.  The question is, Apple says

13  it is a burden.  If you can say look, here is some evidence

14  that shows it really doesn't hurt them, we have done some

15  market research or they have and they are not telling you

16  about it, I get it.  But if it is just look, we don't think

17  Americans would like this, I understand the argument.  You

18  have made it well.  But what more does it get me?

19         MS. KOMATIREDDY:  I think the basic point, you are

20  right, Your Honor, that the -- whether or how the government

21  sought backdoor legislation is irrelevant.  The basic point --

22         THE COURT:  That's what I said?  Okay.

23         MS. KOMATIREDDY:  Here -- the basic point here is,

24  Apple has been doing this for a long time and it has been

25  public for a long time.  The brand hasn't hurt.  That is

1  evidence in itself there is no reputational burden.

2           THE COURT:  Okay.  You are saying the brand hasn't

3  been hurt because it's grown, the company?

4           MS. KOMATIREDDY:  The company has grown.

5           THE COURT:  You have done some regression analysis

6  that factors out other things that may affect the value of the

7  brand?

8           MS. KOMATIREDDY:  I have not, Your Honor.

9           THE COURT:  Okay.  Why don't you move on to another

10  point then.  I think I understand this one.

11           MS. KOMATIREDDY:  Okay.  The Court has made

12  several -- made observation that Congress although it didn't

13  expressly ban what -- the assistance that the government is

14  requesting here, that there is not a gap in the law because

15  recent debate has shown that Congress has refused to authorize

16  what the government is requesting here.  We believe that the

17  Congressional statements that have been made so far are just

18  that, a few Congressional statements, a few proposed bills,

19  but no actual legally cognizable action.

20           THE COURT:  I had a question about that.  This I

21  think gets to the heart of one of the most important issues,

22  which is the applicability of the act.

23           You are saying, that what we have here is

24  Congressional silence and silence is meaningless.

25           MS. KOMATIREDDY:  Yes, Your Honor.

15

1          THE COURT:  If I mischaracterizing, please do

2     correct me.

3          What level of Congressional action or inaction

4     speaks loudly enough for the Court to take into account in

5     deciding whether there is some gap that the All Writs Act

6     fills?

7          MS. KOMATIREDDY:  Actual law.

8          THE COURT:  So short of Congress passing a law

9     prohibiting what you want here, it's fair game?  Anything else

10    that Congress may have done in terms of considering

11    legislation one way or the other, because it doesn't result in

12    a statutory prohibition, wouldn't be enough to say, it's off

13    limits for the All Writs Act?

14         MS. KOMATIREDDY:  Yes.  Short -- essentially yes.

15         Because all that Congress has done so far here is

16    start a debate.  There are 535 members of Congress.  A few

17    have commented.  A few have heard testimony, and there are

18    four proposed bills.  The four proposed bills that the Court

19    cites in its opinion never even were voted on.  They were

20    referred to committee and died there.

21         THE COURT:  How far does this go?  This won't be the

22    last time the government seeks to use the All Writs Act, and

23    as we all know by now, pretty thin list of cases that provide

24    guidance.  So how far does this go?

25         If, for example, Congress voted decisively to reject

1  a bill that would explicitly confer the authority that you

2  want the Court to allow here, took a vote on a bill and

3  rejected it, 434-to-1, is that still Congressional silence

4  because you can't parse why people voted against it?

5          MS. KOMATIREDDY:  I think so, Your Honor.  The

6  reason is this.  Because if there is a Congressional will to

7  actually prohibit this practice, those 435 people could simply

8  pass a law prohibiting it.  In fact, Your Honor has actually

9  cited three bills that have been proposed in the current

10 Congress to ban the exact access we are requesting here.

11 Those bills were not passed.  They did not get out of

12 committee.  They were not the subject of floor debates.  They

13 got no traction.  That can reasonably be read as Congress

14 saying for now, for whatever reasons, all 435 people have, for

15 now the status quo should remain.

16          It's also reasonable to assume Congress is aware of

17 the government practice of government obtaining All Writs Act

18 orders and aware of that background when it makes the decision

19 to act or not act.  In fact, when you look at the hearings

20 that Your Honor cited, part of the testimony at one of those

21 hearings actually made clear that testimony by the FBI

22 executive assistant director made clear that in the past

23 companies had the ability to decrypt devices when the

24 government obtained a search warrant and a court order.

25 Congress is aware of that practice.  The debate that was going

GR      OCR      CM      CRR      CSR

1    on about the so-called going dark issue was about when you get

2    a Court order, the company not being able to get into a device

3    and whether there should be legislation to address that.

4              So I think with all of that in mind, given that

5    Congress doesn't have a developed debate on this, in fact a

6    debate I would say is preliminary, there are no bills that

7    went past committee and in fact bills that were proposed to

8    prohibit this practice were not passed, were not debated, were

9    not voted on.  All that's left is the status quo.

10             THE COURT:  Last -- not last probably, but one more

11    question on how far does this go.

12             Another variation on the scenario I posed before.

13    If you have -- a bill goes through Congress that started out

14    with language conferring the authority you seek here, and

15    unanimous agreement to strip it out of the bill before it is

16    passed, so we still don't have legislation one way or the

17    other on it.  We have a very clear record to take it away from

18    a bill that otherwise would have it.  Still Congressional

19    silence that makes it fair game for a Court to grant the

20    authority under the All Writs Act?

21             MS. KOMATIREDDY:  The hypothetical is, that there is

22    language to prohibit what we are requesting?

23             THE COURT:  No.  Say the government can force a

24    company like Apple to break into one of its phones, where the

25    user won't and has forgotten the password.  So basically, this

1    case codified as part of a larger bill and that provision is

2    unanimously stripped out before it passes.  So we still have

3    the same statutory regime that we have now but we have

4    everyone in Congress voting to take away something that would

5    give you this authority.

6              Still Congressional silence?

7              MS. KOMATIREDDY:  It is, Your Honor, because

8    everyone in Congress could easily vote the other way.

9    Everyone in Congress could easily make an affirmative law that

10   states that it grants this authority.

11             THE COURT:  Okay.  If in doing that they say you

12   know what this is a separate bill.  We are going to do it next

13   week.  It's on the agenda.  We are going to vote on it in the

14   intervening week; still can do this under the All Writs Act?

15             MS. KOMATIREDDY:  Yes, sir.

16             THE COURT:  Okay.

17             MS. KOMATIREDDY:  Because Congressional silence is

18   Congressional silence.  There are a number of examples of

19   Congress considering bills and doing nothing about them.  But

20   that doesn't undermine the current legal authority.  A simple

21   example is the House has passed at least 30 times a bill

22   seeking the repeal of the Affordable Care Act.  That doesn't

23   undermine the Affordable Care Act's reasonable effect.

24             THE COURT:  Obviously the concern is as Congress

25   goes longer and longer due to influences we are all familiar

1   with that we needn't rehearse here, it goes longer and longer

2   without revisiting statutes that are daily getting more and

3   more outstripped by the technology.  It's taking -- this use,

4   this proposed use of the All Writs Act takes away the

5   legislative authority from Congress and puts it squarely in

6   the courts.  It just seems to be so at odds with the

7   separation of powers that we have that it's hard to believe

8   that it squares with the intent of the All Writs Act.

9           MS. KOMATIREDDY:  The All Writs Act was passed as

10  parts of the Judiciary Act of 1789.  Some call it antiquated.

11  It's actually foundational.  It comports with the separation

12  of powers.

13          THE COURT:  It initially passed in 1789.  It has

14  been updated as recently -- Congress passed this version in

15  1949.

16          MS. KOMATIREDDY:  Right.

17          My point is, when Congress created the federal

18  courts it also ensured that whatever orders the federal courts

19  issued it could make those orders effective.  If federal court

20  issues a search warrant, it could to do what it needed to make

21  that search warrant effective if doing so was reasonable,

22  didn't cause unnecessary burden, there were no alternatives to

23  the government, et cetera.

24          So with that in mind it's not unreasonable for a

25  Court to do what is necessary to effectuate its orders.  I

1    don't think that affects separation of powers.

2          As to Congress moving too slowly and therefore

3    delegating what the Court may consider undue authority to the

4    judiciary on this matter, Congress also has to engage in its

5    own agenda setting and prioritization.  Given the number of

6    issues that they have to take up, if they feel -- assuming

7    background knowledge that Congress legislates against the

8    background of current law, if they realize and know how

9    current law operates, which is reasonable to assume they do in

10   this case, and they are fine with it operating the way that

11   they are, there is no reason for them to prioritize this

12   particular issue at the top.

13         In fact, that's what you are seeing here.  Because

14   this application is about IOS 7 and before, which in a few

15   years will probably be an obsolete issue.  In a few years

16   Apple devices aren't even going to carry IOS 7.  So the --

17         THE COURT:  I hope so.  I hope they won't.  Because

18   the Court here won't let me update to eight.  Definitely won't

19   let me get nine.

20         But go ahead.

21         MS. KOMATIREDDY:  You see my point, Your Honor.

22   Because this particular issue is actually probably dwindling

23   in importance.  It's reasonable for Congress to let the All

24   Writs Act continue to apply and debate what it has been

25   debating, the more salient issue of the future of IOS 8 and

1    beyond and devices where even when you have a court order you

2    cannot get access.

3         THE COURT:  One other slightly different question

4    about the Congressional silence here.  Do we actually have

5    Congressional silence?  This is something where I can really

6    use your help.  I acknowledge, I could so easily be getting it

7    wrong.

8         Under CALEA, two related questions.  First, Verizon

9    is a, or AT&T, they are clearly covered by CALEA.

10        MS. KOMATIREDDY:  Yes, Your Honor.

11        THE COURT:  If they were to manufacture the same

12   kind of device with the same sort of software carrying

13   password encryption, would Calea's provision against forcing a

14   provider, telecom carrier to engage in this decryption,

15   prevent the Court from ordering Verizon to do what you want

16   Apple to do?

17        MS. KOMATIREDDY:  CALEA wouldn't address that

18   situation because CALEA only requires the telecommunications

19   carriers retain the capability to intercept realtime

20   communications, data and motion.  Think Title III wiretap.

21        THE COURT:  No.  I know what it requires them to do.

22   But I thought -- this is where my own note-taking has failed

23   me.  I thought there was a provision in CALEA that

24   specifically addressed decryption and it exempted from other

25   obligations of a telecom provider any obligation to provide

1   such encryption services.

2          MS. KOMATIREDDY:  There is a provision in the House

3   and Senate reports that accompanied CALEA where it

4   states -- Congress states that telecommunications carriers

5   have no responsibility to decrypt encrypted communications

6   that are the subject of court ordered wiretaps unless the

7   carrier provided the encryption and can decrypt it.

8          In essence, when considering those realtime

9   communications that are being intercepted on a prospective

10  Title III wiretap, the provider has the obligation to decrypt

11  communications that it is capable of decrypting but not

12  otherwise.

13          (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

GR      OCR      CM      CRR      CSR

- Proceedings -                                23

1      THE COURT:  Okay.  And that may moot the second

2  question.  I will tell you what I have in mind.  On any of

3  this, both sides, if there is something that you think that

4  needs a supplemental submission, you know, I welcome it.  We

5  can talk about scheduling for that later.  I'm sensitive to

6  the need to expedite.

7      Is Apple an information service within the meaning

8  of CALEA?  The reason I ask, because I have that sort of-- the

9  understanding, maybe mistaken, that I asked just a moment ago,

10  whether decryption, there is an exception for decryption.

11      But, so, does Apple qualify as information service,

12  within the statute?

13      MS. KOMATIREDDY:  Your Honor, I don't believe it

14  does.  I am just looking for the specific statutory

15  definition.  CALEA's definition of information service

16  restricts it to telecommunications carrier, classic public

17  utilities, not device manufacturers.

18      THE COURT:  Okay.

19      That was a very long diversion from what I-- an

20  argument you were making, if you can find your place, I

21  welcome you going back to it.

22      MS. KOMATIREDDY:  Fair enough.

23      THE COURT:  If not, I have other questions I could

24  ask.  I wanted you to get to your points.

25      MS. KOMATIREDDY:  I'm a happy to answer any

- Proceedings -                                    24

1    questions from the Court.  We will rely on our briefs for our

2    legal basis.

3             THE COURT:  Okay.  Then I will -- I have to go

4    through my notes.

5             One of the things, just about the burden, I

6    apologize, I will skip around.  You stated the vast majority

7    of cases, where you have gotten assistance from Apple and have

8    been resolved without Apple having to testify.  That makes

9    intuitive sense.

10            Where they have been required to testify, what kind

11   of level of detail is required to authenticate what you get

12   from their services.  Does it ever put them in the position of

13   having to reveal something that is a trade secret or something

14   like that?

15            MS. KOMATIREDDY:  Interesting question, Your Honor.

16            In our survey so far of Government prosecutors, we

17   have not actually identified a specific instance where they

18   have been required to testify.  I have had many prosecutors in

19   those 70-cases say, they were not.  A few say, yet to be

20   determined because the cases are not yet resolved.  Perhaps

21   Apple's counsel has an example.

22            THE COURT:  If you don't mind, do you have a number?

23            MR. ZWILLINGER:  We believe that Apple has been

24   required to testify about twenty times, in cases where they

25   have done these device extractions in the past.  It is not a

- Proceedings -                                                    25

1    comprehensive count either, that is asking the people who have

2    gone to testify.

3              THE COURT:  Do you know if there has ever been an

4    issue in any of those cases, where the nature of the testimony

5    has itself implicated Apple's interests?

6              MR. ZWILLINGER:  From Apple's perspective there is

7    an issue in all cases, to the extent, to prepare people to

8    testify to not go into information that would implicate

9    Apple's proprietary interests.  But, they have managed to find

10   a way to introduce some testimony.

11             THE COURT:  In terms of the burden, it is not a

12   realistic prospect that if you're ordered to do what the

13   Government wants here, at the trial in the case, you are going

14   to have to reveal, how to break a pass code for example.

15             MR. ZWILLINGER:  The burden would not be that that

16   would impose, you know, it would infringe Apple's proprietary

17   interests.

18             On the other hand, in the cases where Apple doesn't

19   have to testify, there is still significant back and forth,

20   signing of declarations, negotiating stipulations.  It is not

21   that every case, where they do a bypass involve the several

22   hours process of a bypass, there is usually extensive work

23   after that, even in cases where they don't have to testify.

24             THE COURT:  Ms. Komatireddy, a separate issue that

25   I'm struggling with here.  Just in terms of how the analysis

- Proceedings -                                        26

1   goes.

2              There seems to be sort of two halves to the

3   analysis, one is, does the act apply at all.  And the second

4   is, if it applies, then we are under New York Tel and the

5   three prong test.

6              There is a part of the burden analysis that keeps --

7   I keep losing my place, trying to figure out if-- is burden or

8   applicability.  It is this.  What you want them to do is not

9   give over information or do something that they do anyway for

10  their own business purposes or make available to you,

11  facilities that are their's, right?

12             Those three characteristics, capture all of the

13  cases you have cited under the All Writs Act.

14             What you are asking them to do is do work for you.

15  I am-- so there are two questions.  One is, analytically where

16  does that fall?  Does it fall into the category, applicability

17  that the All Writs Act either does or doesn't allow that?  Or

18  does it fall into category of, is it an unreasonable burden

19  for purposes of New York Tel.  Do you see the difference I'm

20  trying to get at?

21             MS. KOMATIREDDY:  I do see the difference.  I think

22  analytically it falls under the burden.  The All Writs Act

23  does not specify the nature of the assistance.  The case law

24  simply says from New York Telephone and onwards, a third party

25  can be required to assist.  There is all sorts of situations,

- Proceedings -                                    27

1    even the cases that New York Telephone cites of third parties,

2    really run the gambit of various cases we have cited about

3    corporations giving corporate records, credit cards, video

4    tapes.  But also cases of individuals being asked to answer

5    questions, New York--

6                THE COURT:  Give over information.

7                MS. KOMATIREDDY:  Give over information, there is

8    actually one of the cases that New York Telephone cites,

9    involves an order requiring parents, this is Board of

10   Education versus York, 429 F2D 66 in the 10th Circuit, 1970.

11   Order requiring parents to send their son to a particular

12   school, to further a desegregation.  That is not necessarily

13   information that is not use of a facility.

14                But, so I do think that the All Writs Act doesn't

15   specify or limit the nature of the assistance, it simply

16   provides for assistance.  The nature of assistance is

17   appropriate consideration under the burden analysis.

18                THE COURT:  Look, clearly if it is not part of

19   applicability, it is part of burden.

20                New York Tel also, somewhat confusingly, cites the

21   Battington case, which to me is the clearest example, you know

22   conscripting work.  The cop gets on the running board of the

23   cab, says follow that car.

24                And that is to me is the clearest example in New

25   York Tel of the Court saying, you know, here is a way you can

1   use the All Writs Act.  What they don't talk about there,

2   surprising to me is Battington, there was actually a statute

3   that said it is unlawful for a private citizen to disobey that

4   kind of command.  Exactly sort of the opposite of the

5   application of the All Writs Act which is saying as long as it

6   is consistent with use-- so, that is what got me wondering

7   frankly if the idea of conscripted service, as opposed to the

8   other kinds of assistance that have been afforded under the

9   All Writs Act is sort of a categorical limit on the

10  applicability.

11          So you are saying-- anything-- I'm sorry, anything--

12  10th Circuit.

13          MS. KOMATIREDDY:  <u>Board of Education versus York</u>.

14          THE COURT:  Anything besides York that I should look

15  at?

16          MS. KOMATIREDDY:  I will go back and we can provide

17  further briefing, we will.

18          THE COURT:  Okay.

19          MS. KOMATIREDDY:  May I also supplement my answer?

20          THE COURT:  Please.

21          MS. KOMATIREDDY:  Which is, the Court characterized,

22  this as not a situation where Apple is giving over

23  information.  The actual process of extracting this data is

24  just that, extracting data.  Apple doesn't--

25          THE COURT:  Talking about information that they

- Proceedings -                                    29

1    currently have.  All of these cases are, you know, third

2    party, give me information that you have, or let me use your

3    facilities, right?  Or usually combined with one of the other.

4    In any event, you do this anyway.

5              MS. KOMATIREDDY:  So this is a combination of giving

6    over information and letting the user facilities --

7              THE COURT:  Not information they have.

8              You want them to go into this phone that you have,

9    and do something that you can't do.  You said you can't do.

10   Or here his can't do it.

11             But, this is not information they have.  You could

12   not execute any search warrant in Apple's servers right now

13   and get the information you wanted, right?

14             MS. KOMATIREDDY:  That's correct, Your Honor.

15             THE COURT:  Let me ask you this related question,

16   could you subpoena or use some other form of court process, a

17   warrant, perhaps an All Writs Act order, to have Apple

18   disclose to you, how to get the information from the phone?

19             MS. KOMATIREDDY:  I think the federal Government has

20   authority to issue a Grand Jury subpoena, if not a trial

21   subpoena to call a Apple witness and walk us through exactly

22   how they bypass the software.

23             THE COURT:  There is existing procedure that allows

24   you to do what you want to do here.

25             MS. KOMATIREDDY:  But I think that would be more

RB          OCR

- Proceedings -                                    30

1    burdensome to Apple, Your Honor, involving --

2              THE COURT:  Yes, but under Pennsylvania versus

3    Marshals, you can't use the All Writs Act to do something for

4    which there is a procedure available under more specific law,

5    right?

6              MS. KOMATIREDDY:  Under Pennsylvania versus

7    Marshals, you can't use the All Writs Act to do something that

8    a statute curtails you from doing.

9              THE COURT:  There is a statute that establishes Rule

10   41.  You are saying that under Rule 41, you can call them into

11   the Grand Jury, and have them walk you through how to do this?

12   Why doesn't that end the analysis?

13             MS. KOMATIREDDY:  Well, Your Honor, you can call

14   them into the Grand Jury.  There are a couple of things to

15   consider.  First of all, it is not clear having-- called them

16   into the Grand Jury, we don't believe that we have the

17   technical, actual technical capability by which I mean, the

18   device that Apple uses to bypass the pass code.

19             So, there is still a question about whether it is

20   feasible for the Government to do so.

21             Second, calling them into the Grand Jury could cause

22   a higher burden to Apple in terms of their trade secret

23   concerns.

24             THE COURT:  That is their call, right?

25             Look, this is such a complicated area, we need to

- Proceedings -                              31

1  keep the analytic lines clean, right?  You are wrapping into

2  burden, there is something that could be worse for them.  I'm

3  talking about applicability.  Under <u>Pennsylvania versus</u>

4  <u>Marshals</u>, if there is another statutory path available to you,

5  you have to take it, don't you?

6         MS. KOMATIREDDY:  If there is a statutory path that

7  doesn't permit what is being asked for.  That is not-- what is

8  happening here.

9         THE COURT:  That is because what you are asking for

10  is being defined so specifically, right?  What you are asking

11  for is for Apple to do it for you.

12         MS. KOMATIREDDY:  We are asking--

13         THE COURT:  If what you are asking for is let us get

14  at the information in the phone for which we have a warrant.

15  It sounds like you are saying you do have a way to do that

16  without application of the All Writs Act.

17         MS. KOMATIREDDY:  So, under that theory, Your Honor,

18  you can subpoena, you can use any prior All Writs Act

19  precedent.

20         Take for example, issuing an All Writs Act order to

21  get the credit card records from the credit card company.

22  Under that theory, you can subpoena the credit card witness to

23  testify about the credit card records as opposed to actually,

24  as opposed to actually produce the records.  Or you can

25  subpoena the credit card custodian to come into the Grand Jury

- Proceedings -                                    32

1   and explain how they accessed those credit card records in the

2   internal system.  But that testimony alone we believe will not

3   be sufficient to then go use the system or give the federal

4   Government to use the system to get into the record.

5            THE COURT:  You need the records.

6            MS. KOMATIREDDY:  Yes.

7            THE COURT:  You might need to authenticate those

8   records for, you know, for use in litigation.  The testimony

9   about them is not going to be admissible.

10           But here, what you need is the know how to get to

11  this phone.

12           MS. KOMATIREDDY:  And the technology, Your Honor.

13           Apple uses this technology in its facilities.  It is

14  specific, it can't do this at any Apple store.  You have to go

15  to Cupertino headquarters in their facilities, which I suspect

16  can involve a Faraday room, because of remote wire requests.

17           THE COURT:  Let's get rid of the remote wipe

18  request.  They said, that they essentially block that request

19  that is pending.  Are you saying they are wrong?

20           MR. ZWILLINGER:  Your Honor, if I can clarify that

21  briefly.  The brief wasn't intended to suggest that Apple did

22  anything to cause the remote wipe request to not work.  It is

23  just a matter of fact that the remote wipe request will not

24  work given the state the device is in.  The Court is correct

25  it will not work, but it is not because of action that Apple

1  took.

2          THE COURT:  If it is not in a bag or room, and

3  connects to the internet.

4          MR. ZWILLINGER:  It will not work.

5          THE COURT:  Do you have any reason to doubt that

6  representation?

7          MS. KOMATIREDDY:  If that is the representation

8  Apple is making, no.

9          THE COURT:  So you were saying though why it would

10 not work because they have technology you don't.

11         MS. KOMATIREDDY:  That's right.  We don't believe

12 testimony alone allows us to get into the device.

13         THE COURT:  Okay.

14         You know, this goes back to the thing I will ask you

15 to get back to me on.  But, Bower, the his agent who

16 testifies.  Says they have the device that will do this.

17         MS. KOMATIREDDY:  Yes, I notice-- we will follow up

18 with the assistant who has that case.  I can tell you from my

19 own personal knowledge, that the particular IOS involved in

20 that case, 8.1.2, there are certain -- this is all very

21 operating system specific.  There are-- I have been informed

22 that there are certain technologies that allow the Government

23 independent of Apple, to get into that particular IOS.

24         But based on our investigation, and what the FBI and

25 DEA has told us about the IOS 7 system on the target phone, we

- Proceedings -                                  34

1    are not able to do that.

2           THE COURT:  Is your representation about what the

3    Government can do based on what the FBI and DEA can do, or are

4    you making this representation on behalf of every, I am using

5    the broadest language deliberately.  You make this

6    representation on behalf of every deponent of the Government?

7           MS. KOMATIREDDY:  No, Your Honor, I would not dare.

8           THE COURT:  That is an issue.

9           Look, I don't expect you to easily navigate, the

10   possibility that on the Intel side, the Government has this

11   capability.  I would be surprised if you would say it in open

12   court one way or the other.

13          But, you have to make a representation for purposes

14   of the All Writs Act.  You have them.

15          MS. KOMATIREDDY:  That's correct.

16          THE COURT:  The Government cannot do this.

17          MS. KOMATIREDDY:  When we--

18          THE COURT:  To make that representation, you need to

19   be right about it.

20          MS. KOMATIREDDY:  We are making that representation

21   as the prosecution team.

22          THE COURT:  You are not the prosecution team.

23          You want to conscript a third party.  Before I do

24   that, don't we have to know that you don't have actually have

25   the capability, and by "you", I mean the United States

- Proceedings -                                    35

1   Government?

2          MS. KOMATIREDDY:  I think you have to know the

3   prosecutors in this case and the prosecuting agencies, the FBI

4   and DEA do not have a reasonable available tool.

5          THE COURT:  If Southern District U.S. Attorneys'

6   office has the technology and know how, you can still make the

7   representation, you have just made.  That really allows me to

8   issue an order under the All Writs Act?

9          MS. KOMATIREDDY:  That is a interesting

10  hypothetical.  I think it is unrealistic, the agency is the

11  same.

12         THE COURT:  In terms of which office, not

13  unrealistic.

14         But, that is a joke.

15         MS. KOMATIREDDY:  I got it.

16         THE COURT:  Look, we can slice it finely or not.

17  But, as opposed to your Brady obligation, Second Circuit law

18  clearly saying you are not responsible for everything in every

19  Government office.  This is different.  You are seeking

20  affirmative relief on representation that the Government can't

21  do this.

22         Why don't you have to make that representation for

23  the entire Government?

24         MS. KOMATIREDDY:  Well, because-- at the end of the

25  day, the question for us is, what is the burden on Apple, and

- Proceedings -                                    36

1    is this assistance necessary to effectuate the warrant.

2              THE COURT:  The necessity prong.

3              MS. KOMATIREDDY:  It is the necessity prong, Your

4    Honor, but federal prosecutors don't have an obligation to

5    consult the intelligence community in order to investigate

6    crime.  And in fact, in doing so --

7              THE COURT:  You can ignore it.  But, when you come

8    to the Court and say it is necessary, because we can't do it,

9    why does that excuse you from saying, well, wait a minute, we

10   can do it, as a Government, but we have organized ourselves

11   for reasons that may make a lot of sense in a way that we

12   choose not to.

13             MS. KOMATIREDDY:  Because fundamentally the All

14   Writs Act is a practical gap filing statute.  This is not an

15   academic debate about what is possible.

16             THE COURT:  You are trying to have it both ways on

17   the All Writs Act.  On the one hand, you a few minutes ago,

18   you were saying, you look at it narrowly.  If Congress is

19   silent, even in the face of lots of evidence, that they really

20   thought about this, decided not to do what is at issue here.

21             You know, it is fair game, the All Writs Act.  Now

22   you are saying, look at it practically.  I think you have to

23   choose one or the other.

24             It gets to an interpretive question that I had which

25   is, the reading of it that says if it is not explicitly

- Proceedings -                                          37

1    prohibited by Congress, it is fair game, is one that, I don't

2    have the statute in front of me.  Is one that would be

3    achieved by saying, agreeable to the law.  But we had these

4    other two words, agreeable to principles and usage of law

5    which seems to go beyond just what is in the statutory text.

6            And, you know I wonder if you have a definition of

7    those terms that your, your view of the statute doesn't read

8    out of the text.

9            MS. KOMATIREDDY:  So in terms of whether you're

10   looking at the All Writs Act in a practical way or impractical

11   way, our approach is consistent.  It is a practical approach.

12           The reason we don't accept congressional inaction as

13   having legal force, is because that is a practical approach to

14   Congress.  Congress has all kinds of reasons it doesn't pass

15   statutes including allowing the status quo to continue when

16   they can't agree on a different way.

17           THE COURT:  Right.  But I guess my question is, this

18   is where we get to technical issue principles and usages.

19           We have for example in CALEA, that broadly regulates

20   an industry with respect to electronic surveillance, and then

21   carves out in some respects, the encryption and puts, you

22   know, clearly defined boundaries on when third parties can be

23   conscripted into the task.

24           There is a sense of what is the spirit, what is the

25   principles and usages.

RB        OCR

1        And to my mind that, that is a coherent

2   understanding of the statute.  That where you can infer what

3   Congress was intending, from what they have done and what they

4   have not done, you can fill in the gaps to the extent it is

5   consistent with that overall understanding of legislation.

6        I'm trying to understand how you get to, as long as

7   Congress hasn't explicitly prohibited it, a Court can do it,

8   and make that coherent under the text of the statute.

9        I phrased it badly.

10       Make that consistent with a statute that includes

11  not just agreeable to the law but agreeable to principles and

12  usages of law.

13       MS. KOMATIREDDY:  I understand the Court's concern.

14  I think when looking at CALEA that way, I think there is

15  something to be said, if you have a comprehensive legislative

16  scheme.  The key there is actually a legislative scheme, one

17  passed into law like CALEA that addresses the issue.  If there

18  is in fact comprehensive and addresses ten possible iterations

19  of a particular requested authority, and leaves one out,

20  perhaps there is reasonable inference as a matter of statutory

21  interpretation for an actual statute to say that there is an

22  implied prohibition.  We don't have that here.  CALEA doesn't

23  even come close to addressing the issue we have here.  We

24  don't have a comprehensive statutory scheme about Federal

25  Court's requiring third parties to assist in the execution of

- Proceedings -                                          39

1   a valid search warrant.

2          For as long as that has been happening it has been

3   governed by the All Writs Act.  In this particular context

4   with request to bypass of a pass code where a company is

5   already capable of conducting that bypass.  There is no

6   specific expressed or implied Congressional action on that

7   issue, which is why the law is left where it is.

8          THE COURT:  I do have a couple of more questions.  I

9   don't want you to lose things that you want to say.

10         MS. KOMATIREDDY:  No, that is all right Your Honor.

11         THE COURT:  Your last answer reminded me of this.

12  In terms of, we have a scheme where courts effectuate warrants

13  by calling on third parties.  I asked you before about give me

14  an example, if you have one, requiring a service from a third

15  party.

16         Your argument on this, this goes to the first

17  element of the New York Telephone which we have not discussed

18  yet, how closely related.

19         You have inserted into this, I don't mean that

20  pejoratively at all.  You sort of cast the argument in terms

21  of something New York Tel doesn't talk about.  At least not

22  explicitly.  Apple is in a position to thwart your

23  investigation.

24         I want to make sure I understand.  First of all, are

25  they in a position to do anything going forward to thwart the

- Proceedings -                                              40

1    investigation or is it simply that before you got the warrant

2    they had done something, created this operating system, that

3    gave somebody else the possibility to thwart an investigation,

4    by turning on encryption.

5           MS. KOMATIREDDY:  We are not making an allegation

6    that Apple would affirmatively do something.

7           THE COURT:  There is nothing that they can do to

8    stand in the way of your investigation other than not take

9    action.

10          MS. KOMATIREDDY:  I can't represent what they are

11   capable of doing in terms of, that is not within my kin.  I

12   can say-- the issue, the reason we believe there is cross

13   connection and the way New York Tel frames it, is where a

14   company's services or facilities are being used as part of an

15   ongoing criminal enterprise.

16          And, in fact, this is more fully discussed in one of

17   the other case, <u>United States versus Hall</u>, which is the credit

18   card records case.  It talks at length about the close

19   connection because in that case, it actually says, you know,

20   the case involves federal law enforcement trying to get the

21   credit card records, not of the defendant, but another person,

22   companion.

23          THE COURT:  Come on, in Hall the bank was extending

24   credit to a fugitive, while that person was a fugitive.  It

25   was making it possible on a go forward basis, for the fugitive

- Proceedings -                          41

1   to escape the law.  What is Apple doing here that is

2   comparable to that?  They are taking some action going forward

3   prospectively that is helping the defendant in your case.

4            MS. KOMATIREDDY:  So it was not actually extending

5   credit to the fugitive.  It was extending credit to a

6   companion that would have location information.

7            THE COURT:  While you were trying to catch this

8   person, the bank is taking actions prospectively.  What is

9   Apple doing here that is comparable?

10           MS. KOMATIREDDY:  The common thread is that it is

11  the company's services that are being used by the criminal.

12           THE COURT:  What services of Apple, what service is

13  Apple now providing to the defendant in this case?

14           MS. KOMATIREDDY:  There are three services.  One,

15  the actual pass code lock feature.  The operating system which

16  Apple currently owes and currently licences to the owner of

17  that cellphone.

18           THE COURT:  Can they do anything without taking back

19  something they have sold to the defendant or to somebody who

20  gave it to him, short of taking back something they have

21  already sold, can they do anything to defeat the encryption

22  here?

23           MS. KOMATIREDDY:  I'm sorry, short of taking?  They

24  can assist us by bypassing the lock.

25           THE COURT:  Yes, for them to do that they have to

- Proceedings -                          42

1   take it back, you have to give it to them.

2           MS. KOMATIREDDY:  You are saying, take back the

3   phone.  They already own the software.

4           THE COURT:  What can they do to the software?  I

5   have to say, of all the very good arguments in your brief, the

6   thing about the end user license agreement struck me as a

7   total red herring.  I don't get at all, why what the license

8   agreement does in terms of regulating what any of the parties

9   here can do or can't do, that is of any relevance to the

10  dispute here.

11          MS. KOMATIREDDY:  The relevant point is that Apple

12  owns and currently operates the software that is preventing

13  the federal warrant from being executed.  Because the pass

14  code lock is enabled and still active.  Because the pass code

15  feature that deletes the contents of the phone after ten

16  failed attempts, is possibly enabled and could thwart

17  execution of the search warrant.  I understand that Apple has

18  represented that the remote wipe is no longer available.  So,

19  we can take that out of-- assuming that is true, we can take

20  that out of the analysis.

21          The argument stands that it is Apple's software that

22  is currently operating, that stands between a Federal Court's

23  warrant being executed, and evidence of crime being --

24          THE COURT:  Let me ask you, I think we have all been

25  searching for analogies one way or another here.  I have seen

- Proceedings -                                    43

1    some suggestions about the safe and you know conscripting the

2    locksmith.  It seems fanciful.

3           But here is one that I think is not fanciful.  The

4    last company that makes lethal injection drugs, decides to

5    stop doing it.  In fact Justice Alito referred to this in

6    recent cases, gorilla warfare by these companies.  Right.

7           So the last company that has been providing drugs

8    for execution, says to the Government, we are no longer going

9    to help you out when it is time to execute somebody in Terre

10   Haute.

11          Can -- are they thwarting a lawful death sentence by

12   doing that, and can they therefore be compelled under the All

13   Writs Act to re-import something that is held abroad or

14   release something from existing stock or actually manufacture

15   the drug anew?

16          MS. KOMATIREDDY:  So, with each of these, it is a

17   case by case analysis.  I think we have to return to the

18   factors under New York Telephone and the factors in the All

19   Writs Act.  I think you have to look at what the relevant

20   applicable law is and I have to concede in this area I'm not

21   familiar with the expansive 8th Amendment Law on this.

22          THE COURT:  In terms it is fact specific under the

23   burden, is that relationship close enough for purposes of the

24   first element of New York Tel, to say look, this company, you

25   know they have got the monopoly on this point on doing it, on

- Proceedings -                                    44

1    making these drugs.  Now they are out of business.  They are

2    thwarting us from carrying out a lawful death sentence.

3           Does that get you passed the first step?

4           MS. KOMATIREDDY:  Your Honor, I have to be honest

5    with you here, it is hard to say.  Here is the reason I

6    hesitate with this analysis.  The analogy is different because

7    there, we are not talking about an order that is a warrant

8    that can-- that can be simply executed but for one step in

9    between.  We are talking about a potential death sentence

10   issued by a jury.

11          THE COURT:  Sorry.  Look, that is not right.  It is

12   an order of the Court.  The sentence is, a Court order just as

13   the warrant is a Court order.

14          MS. KOMATIREDDY:  And the question is, whether the

15   company that makes the injection.

16          THE COURT:  They are the last company around and

17   there are fewer of them.  We get to the point where there is

18   one.  They say, you know what, they are not going to do it,

19   deliberately to try to frustrate public policy, right.  We

20   don't want there to be executions, so we are going to withdraw

21   the drug from availability.  The All Writs Act, can tell them

22   to do otherwise.

23          MS. KOMATIREDDY:  That would depend on the law of

24   whether you can require a company.  That could depend on

25   several things.  The relevant Food and Drug law, whether you

- Proceedings -                                    45

1   can require a company to develop a drug in that manner.

2           THE COURT:  There is silence on this.  We are in the

3   exact same position as we are here.  You have silence.

4           You are doing a really wonderful job of representing

5   the Government here, but you understand the question I'm

6   trying to ask.

7           MS. KOMATIREDDY:  I do understand the question.  It

8   is a tough question.

9           The thing that is particularly tough about that

10  question is, it is hard to say, so there are two questions,

11  you have asked.  One, does the All Writs Act permit that

12  order.  That requires considering all three of the factors.  I

13  have.

14          THE COURT:  But that is not the question I asked.

15  The question I asked is, does the intent to thwart the

16  execution of that death sentence, bring the company closely

17  enough to thwarting of a lawful court order that you satisfied

18  the first element of New York Tel.  Not does it satisfy all

19  three elements, just the first.

20          MS. KOMATIREDDY:  So, I don't think it is intended

21  to thwart, but establishes the connection.  Based on the case

22  law I reviewed from New York Tel and United States versus

23  Hall.  It is when the company's facilities are being used in

24  some way.  I mean this context, in some way, for an illegal

25  purpose.  So in that context it would be the company so called

- Proceedings -                    46

1   facilities, drug making features are being used or not being

2   used.

3          THE COURT:  Right.

4          MS. KOMATIREDDY:  So, the difficult part of that

5   question is, understanding who is sufficiently closely

6   connected.  It may be that company, it may be someone else is

7   more closely connected.

8          So I --

9          THE COURT:  Like who?

10         MS. KOMATIREDDY:  It may be that you can-- the

11  Federal Government can develop those things on its own.

12         THE COURT:  You mean like here, the Government might

13  be able to find the technology and know how on its own,

14  perhaps by asking his.

15         MS. KOMATIREDDY:  So.

16         THE COURT:  Right?

17         MS. KOMATIREDDY:  I think I have addressed the his

18  point.

19         THE COURT:  I know.  Theoretically the Government

20  can do this.

21         MS. KOMATIREDDY:  No, Your Honor.

22         THE COURT:  Theoretically, in the hypothetical, the

23  Government can do it on its own.  The same here.

24         MS. KOMATIREDDY:  Based on our investigation, we

25  can't bypass the pass code on this particular phone.

- Proceedings -                    47

1        THE COURT:  Right.  I am positing a scenario, where

2   there is nobody else who is making this drug.  So I'm trying

3   to make it as close as possible.  I just-- instead of fighting

4   the hypo, I really appreciate addressing the question I'm

5   trying to ask, which is, does it satisfy the first test, that

6   first prong of the New York Tel test in the -- that drug

7   scenario, context.

8        (Pause.)

9        MS. KOMATIREDDY:  I apologize for taking a moment.

10       THE COURT:  These are hard questions.  No problem.

11       If you want to consider it and get back to me, I

12  completely understand and that is fine.

13       MS. KOMATIREDDY:  Your Honor, the hypothetical is so

14  inflammatory, I would like to consider it and get back to you.

15       THE COURT:  It is purposefully so.  Because to some

16  extent, what you are talking about, and this gets to very much

17  the burden in New York Tel.  You are saying, it is not much of

18  a burden.  And part of how you get there is, well, the

19  American people would not think that, you know, a company

20  would not want to help law enforcement.

21       But, at some point, not just a matter of marketing

22  and dollars and cents.  At some point, a private actor, I'm

23  not saying necessarily Apple has.  Somebody can say we don't

24  want to do this.  As a matter of conscience, this is something

25  we don't think should be done.

- Proceedings -                                48

1           I'm trying to draw parallels intentionally to the

2    company that says, we don't think our drugs should be used to

3    kill people.

4           Can the All Writs Act compel service over a

5    conscientious objection which is very different from saying,

6    can it compel information or the use of a facility.  There is

7    something just categorically different about compelling

8    service.

9           So, yes, it is intentionally a tough and

10   inflammatory hypothetical because I want to get a sense of how

11   far you are -- understanding of the All Writs Act goes.

12          MS. KOMATIREDDY:  I'm happy to consider that further

13   and get back to you on that Your Honor.

14          But I would note that in this case, there is no

15   conscientious objection.  Apple has been doing this for years

16   without any objection.

17          THE COURT:  Right.

18          MS. KOMATIREDDY:  And they are more concerned about

19   public perception, which is a fair concern, but that is not

20   the law.  And, the law shouldn't change that perception.

21          THE COURT:  I don't know if it is or not.  I really

22   don't know.

23          I am almost not completely exhausted the questions I

24   wanted to ask you, I very much appreciate how responsive you

25   have been, especially, you have indulged sort of my jumping

1   all over the place.

2           The last one, this goes back belatedly to

3   Congressional inaction.

4           There is a case from the Ninth Circuit, 1970, that

5   is cited but not really taken on analytically in New York Tel,

6   called application for United States for relief, Ninth

7   Circuit, 1970.

8           And, in that case, the Ninth Circuit did what I was

9   suggesting before, sort of like looking at the sort of overall

10  state of the legislation, what has been done and what hasn't,

11  and denied the refund of the All Writs Act there.

12          What was going on there, was a request for telecom

13  assistance for a wire tap after the original statute was

14  passed in 1968, but before Congress acted to-- partly in

15  response to this case, to require telecom assistance.

16          New York Tel cites it, but I don't think they are

17  really saying they were wrong.  They weren't saying they were

18  right either.  But it does have a reading of the All Writs Act

19  that seems to be disagreeing with you, about the meaning of

20  Congressional silence or the lack of affirmative legislation.

21          Again, if you don't have a case clearly in mind that

22  is fine, I will let you respond later.

23          Did the Ninth Circuit get it wrong there, or can you

24  square it somehow with your understanding of the meaning of

25  Congressional inaction here.

- Proceedings -                                    50

1        MS. KOMATIREDDY:  I need to review the case to get

2   back to you.  The distinction that pops out from the outset is

3   if it is a case about requiring assistance for Title III wire

4   tap and there is a Title III wire tap statute which in itself

5   is an extensive statute already in place.  You have the

6   presence of a complicated relatively exhaustive statutory

7   scheme.  So there is something to be said there for reading

8   it, that the entirety of that statutory scheme and absence of

9   specific authority which would otherwise be obvious, missing

10  from that statutory scheme.

11       I am happy to review the case and follow up on that.

12       THE COURT:  I may well have skipped some things, but

13  I want to hear from Apple, give it a chance as well.

14       But, if you have not had a chance to get to some

15  arguments, I want to hear them.

16       MS. KOMATIREDDY:  Your Honor, we are happy to hear

17  from Apple.

18       THE COURT:  You have been very patient there Apple.

19       MR. ZWILLINGER:  Thank you, Your Honor.

20       There were two points I wanted to emphasize and the

21  Court touched on both of them.  But I just would take a little

22  time to underscore them.

23       We do believe that providing expert services on a

24  device in the Government's custody, is different than

25  providing access to records or facilities that are in our

RB          OCR

1   possession and control.

2           In all of the cases that you mentioned, the

3   Government cites, involve records or facilities that are in

4   the third party's control.  For example, there were logs from

5   the phone company, there are credit card transactions from a

6   credit card company, there were surveillance tapes in an

7   apartment complex.  They were not only in the possession and

8   control of a third party, but they were in the normal course

9   of their business.

10          Here we put a device in the stream of commerce.  The

11  Government is asking us to essentially do what they want and

12  would like to have their own agents do, which is perform

13  forensics services and unlock it.  That type of conscription

14  does not have a precedent in the All Writs Act cases that have

15  been cited.  So I wanted to focus on that.

16          The second is, the most important difference between

17  this and what was set out in New York Telephone, is that there

18  is no indication that Congress intended the Government to have

19  this power here.

20          In New York Telephone, there was a greater included

21  power.  There was a greater power which was the power to wire

22  tap the contents of communications.  And the Government said

23  that surely has to include the lesser included power of

24  performing a pen register.  And not performing the pen

25  register would have frustrated the intent of Congress.

- Proceedings -                                    52

1          In this situation it is the exact opposite.  Law

2     enforcement is seeking an order that the Congress has never

3     authorized, and it is not a subset of the authority that

4     Congress has already granted.

5          We are talking about CALEA.  We agree, that this is

6     outside the bounds of CALEA, but we draw completely different

7     conclusions from that.

8          CALEA only covers data in transmissions, but only

9     providers, only certain types of providers, providing certain

10    types of services, were given the obligation to build in a way

11    to assist law enforcement.

12         And, Ms. Komatireddy points out that Apple is

13    outside that scope.

14         (Transcript continues on next page.)

15

16

17

18

19

20

21

22

23

24

25

53

1          THE COURT:  Are you inside the scope of the

2  information service?

3          MR. ZWILLINGER:  I need to get back to the Court on

4  that.  I don't think we've taken a position on that, but we're

5  outside the scope of what's a required actor under CALEA.

6          THE COURT:  Go ahead.

7          MR. ZWILLINGER:  And CALEA is where Congress has

8  been debating making amendments or amending the statue to

9  encompass a wider variety of services and a wider variety of

10  providers and that's the debate that Congress needs to have.

11          What's going on here is this is not a gap in the law

12  that the All Writs Act would fill in.  This is pushing the law

13  to a new frontier and if the government wants these types of

14  authorities to require providers to provide forensic services

15  to the government, I think the place to go is Congress because

16  we can't use the All Writs Act which, as we had some

17  discussion, was passed in 1789 and amended in 1946, to

18  circumvent this question.  This is the question of the time

19  which is what is the balance between privacy and government

20  access today and Congress needs to speak on that and if we

21  give the government the power they're asking under the All

22  Writs Act, we circumvent that entire debate.

23          THE COURT:  Can I ask, on the issue of burden, even

24  if you're not sort of legally foreclosed in any way from

25  making the arguments you are making, I am troubled by the fact

1  that there is a history here and it's not just, you know,

2  saying here is what you need to do, government, if you want

3  something from us.  You are writing a request for them and it

4  is hard for me to think of an analogous situation where

5  somebody who does not want to do something says, but I'll tell

6  you how to get it done.

7           MR. ZWILLINGER:  Let me address that.

8           THE COURT:  What explains why you are providing this

9  kind of help?  Is it not that, hey, you know, we want to

10  foster law enforcement, we do, we just don't want to be seen

11  out there as, you know, compromising the privacy of our users'

12  devices?

13           MR. ZWILLINGER:  Right.  So let me address that in

14  two ways.

15           First, the legal backdrop of this, by the way, is

16  under New York Tel, the question was is the activity something

17  that the provider does in their normal course of business and

18  is it offensive in any way to the provider.

19           Apple doesn't do this and never did this

20  voluntarily.  Apple was always compelled by a court order to

21  perform these services when it did it and all of that was done

22  in an ex parte proceeding, the same type of proceeding that

23  would result in the authorization of a search warrant.

24           THE COURT:  I'm sorry.  It's not just these are

25  ex parte proceedings.  You get one of these orders.  If you

1    don't like it, you know you can go to a court and say, you

2    know, relieve us from this obligation or, if you've had

3    several of these things and you don't want to keep doing it,

4    you can seek declaratory judgment, right, because there's

5    clearly the ongoing controversy that will get you past the

6    jurisdictional bar.

7           If you didn't want to do this, if it was really

8    burdensome to you, do you disagree that you had steps

9    available to you that you have just not taken?

10          MR. ZWILLINGER:  Apple could have challenged the

11   order that they received, there's no question it could have,

12   but also the weight of the authority was that Apple was

13   regularly receiving these orders from magistrates, receiving

14   these orders from courts indicating that Apple was being

15   compelled to do this and no court and no state court or

16   federal court had invited Apple to submit its views.

17          THE COURT:  But, clearly, you don't need to be

18   invited to court when you think your interests are at stake

19   and you have been getting these orders but from the very few

20   that I have seen with the exception of the one in the Southern

21   District which I don't think was to Apple, whatever XXX Inc.

22   was, it appears not to be Apple, but there has been one that's

23   been publicly available out of Oakland.

24          From all I can see in these cases, there are

25   boilerplate applications and boilerplate orders and nothing

56

1   about them, again, from the limited slice of it I've seen,

2   that would have suggested to you, I think, well, it's futile

3   for us to go to court and try to win the case because they've

4   decided the issue.

5        MR. ZWILLINGER:  Well, I would think the fact that

6   we were repeatedly getting these orders and being contacted by

7   law enforcement did play into the fact that it seemed that

8   this had been somewhat settled views and settled authority

9   from multiple judges.

10        THE COURT:  But, look, you know how it works,

11   especially at the magistrate level.  There are plenty of just

12   very pro forma applications and orders that get signed and the

13   fact that that happens doesn't necessarily indicate that the

14   issue has been given the kind of thought that would be

15   required if you were to challenge it and seek to vindicate

16   your perceived rights.

17        So, I am just trying to understand why I shouldn't

18   read something into the fact that you have never tried to

19   challenge these orders.

20        MR. ZWILLINGER:  Let me make one comment about the

21   language though because I think it's important.

22        One of the reasons for the language that we offered

23   to law enforcement is because we were getting so many orders

24   and the orders were not consistent as to what Apple was and

25   wasn't required to do, and because there were questions

1    related to, you know, does Apple have to decrypt the device,

2    does Apple have to do X or Y, certain language was come up

3    with so that if Apple saw that in an order, it would be clear,

4    one, that it was being compelled to perform these services,

5    and it wasn't, you know, any voluntary action on its part,

6    two, exactly what services it was being required to do and

7    what it wasn't required to do.

8         So, the point of the standardized language was, in

9    fact, because we were getting these with such frequency, that

10   we wanted to accomplish that and make it clear that we were

11   being compelled.

12        THE COURT:  Okay.

13        MR. ZWILLINGER:  So I don't think giving the

14   language is a concession to the fact that the All Writs Act

15   provides authority to issues those types of orders.

16        THE COURT:  Look, your language doesn't invoke the

17   All Writs Act, I get that, but in terms of the burden, first,

18   you haven't challenged it and you still haven't explained why

19   not.  Second, you provided language for reasons I understand

20   about consistency, but you also did not say anything about

21   burdens beyond the immediate expense.

22        If you are saying we want to craft language that is

23   going to say here's exactly what we have to do, you require,

24   if I'm not mistaken -- I don't have the language in front of

25   me.  Do you require compensation?

1        MR. ZWILLINGER:  No, we've never required

2   compensation.

3        THE COURT:  But you can, and you don't do anything

4   about that.

5        I mean, the point is well taken that Apple is a

6   pretty darn big company, maybe they don't care so much about

7   the costs of these 70 things in the big picture.  It just

8   seems to me that there's a dog that didn't bark here.

9        MR. ZWILLINGER:  I think the way to address this,

10  Your Honor, is the following.

11       Right now, Apple is aware that customer data is

12  under siege from a variety of different directions.  Never has

13  the privacy and security of customer data been as important as

14  it is now.  And, in fact, Apple built an operating system

15  which is why we're only talking here about IOS 7 systems,

16  operating systems IOS 8 and IOS 9, that puts Apple in a

17  position where it cannot do this, that is, going forward with

18  390 percent of the devices involved, Apple cannot perform

19  these services.  So, Apple has taken itself out of the middle

20  of being in a position where it can be used as an attack

21  vector or in any way to compromise the security and privacy of

22  customer devices.

23       So, when the court asks Apple today does the All

24  Writs Act provide authority to force it to do this, Apple says

25  no, it does not, because what we are being forced to do is

1    expert forensic services, we're being forced to become an

2    agent of law enforcement and we cannot be forced to do that

3    with our old devices or with our new devices.

4           THE COURT:  One of the arguments you make about

5    burden is that complying with the order implicates the trust

6    relationship that you have with your customers.  I'm not sure

7    I understand why.

8           I mean, as you have taken pains to make clear in the

9    language you propose, you only break into one of these phones

10   if you're compelled by law.  Well, we all have an obligation

11   to follow the law.  So how does that imperil the trust

12   consumers have?

13          MR. ZWILLINGER:  Well, it's a somewhat ironic

14   question in light of the prior question which is why hasn't

15   Apple been challenging these in the past.  That is, if Apple

16   in a position where it is no longer going to be able to turn

17   these devices and bypass them and give data to law enforcement

18   and now Apple is being invited by this court to comment on its

19   views, I think Apple's views are we are not in the business of

20   accessing our customers' data, we have never been in the

21   business of accessing our customers' data and we shouldn't be

22   in that business either on our own or being conscripted by law

23   enforcement.

24          THE COURT:  Okay.  Explain to me sort of the path

25   from you're ordered to do something unwillingly to because you

1    did so, consumers lose confidence in you.

2            MR. ZWILLINGER:  I think it's the same question you

3    asked me a minute ago, why didn't Apple challenge the prior

4    orders.

5            THE COURT:  No, it's not.  It's really a different

6    question.  That's why I'm asking it again.

7            In other words, tell me the thought process in some

8    hypothetical consumer's head.

9            MR. ZWILLINGER:  Well, I think a hypothetical

10   consumer could think if Apple is not in the business of

11   accessing my data and if Apple has built a system to prevent

12   itself from accessing data, why is it continuing to comply

13   with orders that don't have a clear lawful basis in doing so.

14           THE COURT:  Well, clear lawful basis, but when a

15   court says you must do it, and I have considered your

16   arguments about a lawful basis, and still saying, sorry, you

17   have an obligation or you're paying a fine or somebody is

18   going to jail, how does that imperil trust?

19           MR. ZWILLINGER:  So I think the answer is if it

20   becomes crystal clear, if you say and whatever other court

21   this goes to after you say that the All Writs Act provides

22   clear authority to do this and that we have found that there's

23   sufficient basis in law to conscript you into government

24   service, then it wouldn't undermine customer trust, but at

25   this point, it does because right now, it's not clear.

1          THE COURT:  But, see, that's why I'm having trouble

2     and it does go back to the earlier question.

3          The thing that does seem to imperil consumer trust

4     is not that you comply with a court order, but that you don't

5     take all the steps available to you to fight that order before

6     complying.

7          Here, you're doing that at invitation and I don't

8     know what plans, if any, and you don't have to tell me what

9     lies ahead if I grant the government's motion, but you have

10    had apparently 70 prior instances where you have not taken the

11    steps available to you.  That I can see imperils the trust,

12    but complying with an order after you fight it, how is that

13    going to do it?  And if you want, address why doesn't it

14    imperil trust to the point that it's hard for me to put much

15    weight on your burden argument if in the past you haven't

16    taken these steps.

17         MR. ZWILLINGER:  Well, I think of two things.

18         One is having been in this area of law a while, we

19    have seen the law evolve.  Right?  There was a time when cell

20    site data was available with a mere subpoena by the

21    government.  There was a time when contents of communications

22    was available with a subpoena or court order by the government

23    and now it's accepted as somewhat orthodoxy that a warrant is

24    required for contents of communications.

25         So, the law evolves and by understanding that the

1  All Writs Act doesn't provide the clear cut authority that

2  Apple once may have thought it did, I think Apple has to

3  continue to say that if Apple is forced to do what it does not

4  want to do -- right?  The court posited the question before,

5  is Apple saying it does not want to do this.  Apple is saying

6  it does not want to do this.  It does not want to be in the

7  business of being a mechanism by which customer data is

8  disclosed.  Although it will comply with lawful orders when

9  required to do so, it doesn't think that that's the position

10  that Apple should be in and Apple has communicated to its

11  consumers that it doesn't want to be in that position.

12          THE COURT:  I was discussing with Ms. Komatireddy

13  alternate means that might be available.

14          MR. ZWILLINGER:  Yes.

15          THE COURT:  What's your take on, from both a

16  technical level and the legal one, the alternative of subpoena

17  or other process ordering Apple to tell the government how to

18  break into the phone?

19          MR. ZWILLINGER:  So, before I address that, can I

20  clarify something on the record --

21          THE COURT:  Yes.

22          MR. ZWILLINGER:  -- with regard to the question you

23  asked about the Djibo case?

24          THE COURT:  Yes.

25          MR. ZWILLINGER:  It was my understanding that

1   Ms. Komatireddy said that this concerns an IOS 8 system.

2   Apple is not aware of any mechanism to break into an IOS 8 or

3   IOS 9.  Not aware of it at all.  I think this was speculation

4   in the testimony, but the testimony did say that the declarant

5   here or the person testifying, the forensic expert, said that

6   he personally broke an IOS, an iPhone 4S running 7.0.

7           THE COURT:  But he was also saying that he

8   understands that it has been used successfully for 8.1.2 which

9   is the phone --

10          MR. ZWILLINGER:  We're not aware of that.  We're not

11  aware of that indication.  We have heard that there were third

12  parties advertising the ability, forensic service providers

13  the ability to access a 7.0 phone.  We have no independent

14  verification of that, but we had heard that as well.  So there

15  may be other means for this case for this phone although we

16  don't think those exist in the future.

17          As to your question, however, we do agree with the

18  government that we do not think there's an easy mechanism by

19  which Apple can disclose to the government the method of

20  access.

21          THE COURT:  Technically or legally?

22          MR. ZWILLINGER:  Well, we don't think, legally, we

23  can be forced but, technically, we don't think it would work.

24  The way the system is configured, it requires certain

25  authentication from our servers and on that point, I think

1   Ms. Komatireddy was correct that we couldn't provide the

2   instruction manual that would just work.

3         THE COURT:  Just to close the loop, why, legally?

4   What would be the bar to the subpoena or even an All Writs Act

5   order because information is clearly something that an All

6   Writs Act order covers obviously?

7         MR. ZWILLINGER:  I think it would be forcing the

8   company to disclose some of the most confidential trade

9   secrets it has and I think Apple would find that the legal

10  justification in this case wouldn't be there for that type of

11  order, we would argue.

12        THE COURT:  Burden or just not --

13        MR. ZWILLINGER:  Even more.  I mean, we're talking

14  about at this point, you know, the most confidential trade

15  secret issue, but we don't think we have to get there.  We

16  agree with the government that the system requires Apple

17  authentication.

18        THE COURT:  Okay.  There was another burden question

19  I wanted to ask you and it slipped my mind unfortunately.

20        MR. ZWILLINGER:  If I could, Your Honor.

21        THE COURT:  Yes.  Go ahead, please.

22        MR. ZWILLINGER:  I do think Ms. Komatireddy's

23  argument or review of what Congress has been discussing is far

24  too narrow.  She said the debate was just about providing law

25  enforcement access to certain types of communications.  I

1    don't think that's what the debate has been about.  The debate

2    has been an entire societal debate about the role of providers

3    and being required to assist law enforcement and I think the

4    debate covers this topic and a variety of other topics.

5              So, this doctrine that Congressional inaction can't

6    be used as a basis for making this decision I think doesn't

7    apply in All Writs Act.  The whole point of All Writs Act is

8    to figure out what Congress has passed and hasn't passed and

9    are you filling in a scheme that has some interstitial

10   problems or are you giving authority that Congress never

11   intended.  So I think you have to look at what Congress has

12   done and hasn't done.  CALEA is a comprehensive scheme by

13   which certain types of providers are required to provide

14   assistance for law enforcement.  That's the title of the

15   statute.

16             So, I don't think her view is correct.  I think,

17   one, you have to consider what Congress has chosen not to do

18   and, two, you have to lock at CALEA and say what was the

19   bargain struck with CALEA, who was required to perform

20   services and who was not, and then decide whether this is an

21   issue that the court can fill in.

22             THE COURT:  This does remind me of the question I

23   had before and it was somewhat related.

24             Look, is it really burdensome for you in a bigger

25   picture sense to do what the government wants here?  And there

1    are two things I have in mind.

2            One is, in sort of a narrower sense, your brief

3    almost makes the argument.  It's an advertisement for buying

4    our new phones, right, because we won't be able to do this.

5    If you just get our newer phone, we can't do this for the

6    government.  So, yes, sell more phones.

7            The second one, and not quite as facetiously, there

8    is a broader societal debate and it seems that it's reached a

9    point somewhat to your liking quite recently which is as

10   things currently stand, the administration isn't seeking

11   back-door legislation.

12           Are you worried at all that a decision here and in

13   other courts like it saying you can't rely on the All Writs

14   Act which the government may have been assuming it could would

15   reopen the question for the government and for Congress to

16   have back-door legislation.

17           In other words, are you better off having the

18   transitory orders under the All Writs Act?

19           MR. ZWILLINGER:  I think on the second point first,

20   Apple is better off for having a robust public debate that if

21   new authority is going to be granted and we do this, leading

22   down the road to all sorts of new authorities, it should be

23   done by Congress.  So whether advantageous -- the result is

24   advantageous or not, the process is right to go to Congress

25   and have a public debate and not to do it this way.

1          THE COURT:  Okay.

2          MR. ZWILLINGER:  Going back to your first point

3     about the advertisement for the new phones, one of the

4     problems with the type of authority that the government is

5     seeking is that it's hard to draw the line where it stops.

6     Would it stop at unlocking?  Why wouldn't the government say

7     all the same things about modifying software?  Why wouldn't

8     they claim we have a Title III order and the only way to get

9     it to be implemented is if we ask you to you make changes to

10    the product?

11         THE COURT:  There was a case like that, wasn't

12    there?  I'm blanking on it.  It was essentially trying to set

13    down an update to the phone that would allow the government to

14    do something that it had gotten authority for.  Does that ring

15    any bells?

16         MR. ZWILLINGER:  We're not aware.

17         THE COURT:  I'm sorry.  I hope I'm not making it up.

18    Go ahead.

19         MR. ZWILLINGER:  The point is that the line drawing

20    question, that is, the authority they're seeking, if Apple

21    stays sufficiently involved with a product that's admittedly

22    locked and in a draw, the argument under New York Tel prong

23    one that we're sufficiently involved in this product, we're

24    doing nothing with this device right now.  It's sitting in a

25    drawer locked.  We're providing no services to it.  If the

1   government thinks that we're sufficiently entangled with it

2   such that we can be ordered to take affirmative steps, it

3   doesn't seem obvious where that line stops.

4           So, the question is isn't this just solved,

5   everybody will just buy the new phone, no, not if this

6   authority that the government is seeking is granted because it

7   is not clear how far it will extend.

8           THE COURT:  All right.  I didn't want to keep you

9   from making other arguments you wanted to make.

10          MR. ZWILLINGER:  If you would give me one moment.

11          THE COURT:  Sure.  Yes.

12          (Pause.)

13          MR. ZWILLINGER:  Your Honor, I think we've made all

14  the affirmative points.

15          THE COURT:  Do you want to add something in

16  response?

17          MS. KOMATIREDDY:  Yes, Your Honor.  I just wanted to

18  make two points to supplement the record.

19          First, I know the Court's main question was what All

20  Writs Act authority is there to require actual assistance,

21  services, not just information.

22          THE COURT:  Yes.

23          MS. KOMATIREDDY:  And I think a fair way to

24  characterize what's going on here is that we are asking for

25  technical assistance.  We're also asking for information as

1    counsel just represented, the actual bypass and process

2    information required from Apple's servers that it has.

3             If you look at <u>New York Telephone</u> and one of the

4    other cases that we've cited from the District of Puerto Rico,

5    <u>In Re Application</u>, which orders the phone company to assist in

6    essential monitoring, in those cases, the court issues All

7    Writs Act orders both for information and for technical

8    assistance in order to effectuate that particular obtaining of

9    information.  So, labor is conceived as part of the types of

10   assistance that a court can require.

11            MR. ZWILLINGER:  Your Honor, I'm very glad she

12   brought up that District of Puerto Rico case because I think

13   she's reading it exactly wrong.  The court denied authority

14   under the All Writs Act in that case.  The court ruled that

15   the All Writs Act did not provide a basis for authority and

16   said Rule 41 provided the authority.

17            THE COURT:  I'm reminded of Judge Nickerson who

18   argued before the Supreme Court.  One Justice thought a case

19   said one thing and another one thought it said something.  The

20   lawyers argued very different readings of the same case and a

21   Justice said, well, how are we supposed to resolve this?  And

22   Judge Nickerson said, I'm afraid Your Honor will just have to

23   read the case.  I have to do that.

24            MR. ZWILLINGER:  I would proffer that but the

25   language is fairly clear.  The government has -- issuance of

1    the requested order directly under the All Writs Act would not

2    be necessary or appropriate in aid of this court's

3    jurisdiction where no jurisdiction exists thus, there must be

4    a separate jurisdictional basis for me to grant this

5    application.

6              MS. KOMATIREDDY:  You're right, and the separate

7    jurisdictional basis is Rule 41.

8              I mean, the thing is with these All Writs Act

9    orders, historically what's happened is the government has

10   asked for two things.  One, it's asked for the court to

11   provide, to allow it to obtain a certain amount of information

12   and provide, through the All Writs Act, access and authority

13   to get that information and then, second, for the court to

14   instruct a third party to assist in obtaining that

15   information.

16             Here, we don't have to do that.  This case is

17   actually more narrow because the government has separate legal

18   authority, a search warrant, to obtain the data.  All we're

19   asking for is technical assistance.

20             THE COURT:  I get it.  One last thing.

21             The <u>Pennsylvania versus Marshals</u> case, the court

22   ended up saying there that the court could not require the

23   Marshal Service to transport a prisoner who was required to be

24   in federal court.  Right?

25             MS. KOMATIREDDY:  Right, but, Your Honor, in that

1  case, there was actually a habeas statute that was directly on

2  point and the habeas statute had a provision that said that

3  state court personnel were required to do the transfer.  So in

4  that instance, again, you have a statute that is not on point.

5  Very different from here.

6              THE COURT:  If not by statute, I know it's

7  counterfactual, would it pass the burden test and all the

8  other prongs of New York Tel?

9              MS. KOMATIREDDY:  I think so.  It depends a little

10 bit on the burden.  I think the question about close

11 connection is easier there because if it's a transfer as it

12 was in that case of a state prisoner to a federal facility, at

13 least the United States Marshals have some relation to the

14 federal, to that part of the system.

15             THE COURT:  But they're not standing in the way of

16 the transport.  They're just not doing it.

17             MS. KOMATIREDDY:  Yes.

18             THE COURT:  In other words, in that way, it seems to

19 be very analogous to this case.

20             MS. KOMATIREDDY:  That's true, Your Honor, and I

21 think this is why it's important to look at all of the factual

22 situations of that particular circumstance because in all

23 likelihood, if I were to suppose what would happen in that

24 situation, the court gives an order to transfer a particular

25 prisoner, the government probably would just send an agent as

1    opposed to request the assistance of marshals.

2         THE COURT:  Right.  You said there was a second

3    case.

4         MS. KOMATIREDDY:  Yes, Your Honor.  We followed up

5    with the Assistant who handled the case in Djibo, 15-CR-088,

6    and I'll at least provide some additional information on how

7    we believe we got into this pass code, but I want to represent

8    to the court that I'll personally follow it up after our

9    hearing is over.

10        My understanding is I'm advised the technology in

11   that case worked by trying every possible pass code.  In that

12   case, they did not have a reason to believe that the feature

13   that initiates a wipe after ten failed attempts was activated.

14   Here --

15        THE COURT:  The testimony, and I know you haven't

16   had a chance to read it, but the testimony talks about that

17   and defeating that, I won't pretend to have followed exactly

18   the technical explanation, but to defeat that, rather than it

19   wasn't turned on.

20        MS. KOMATIREDDY:  All right.  You know, in terms of

21   better practice, let me consult with the AUSA and I'll get

22   back to you.

23        THE COURT:  Okay.

24        All right.  Everybody, this has been very, very

25   helpful and really wonderful advocacy by both sides.  I am

1    happy to set a schedule for you to get back to me on the

2    various items that have come up, just a letter from each side.

3              How long do you want?  I would like simultaneous

4    letters rather than giving one side priority over the other.

5              MS. KOMATIREDDY:  We would request two days so

6    Wednesday.

7              THE COURT:  Wednesday.  Would that work for you

8    guys?

9              MR. ZWILLINGER:  I think we can do Wednesday.

10             THE COURT:  Okay.  Great.

11             MR. ZWILLINGER:  Thank you, Your Honor.

12             THE COURT:  All right.  Then I will get a decision

13   out as quickly as I can.

14             Thank you all.  Have a very good day.

15             MS. KOMATIREDDY:  Thank you, Judge.

16             (Matter concluded.)

17

18

19

20

21

22

23

24

25

## 1

**10th** [2] - 27:10, 28:12
**11201** [1] - 1:18
**11:30** [1] - 1:12
**15** [2] - 1:8, 2:10
**15-CR-088** [1] - 72:5
**1789** [3] - 19:10, 19:13, 53:17
**1900** [1] - 1:23
**1902** [2] - 1:8, 2:10
**1946** [1] - 53:17
**1949** [1] - 19:15
**1968** [1] - 49:14
**1970** [3] - 27:10, 49:4, 49:7

## 2

**20036** [1] - 1:23
**2008** [2] - 8:9, 8:21
**2014** [2] - 5:15, 6:19
**2015** [3] - 1:12, 3:12, 6:19
**225** [1] - 2:1
**26** [1] - 1:12
**271** [1] - 1:18

## 3

**30** [1] - 18:21
**390** [1] - 58:18
**3rd** [1] - 3:13

## 4

**41** [4] - 30:10, 69:16, 70:7
**429** [1] - 27:10
**434-to-1** [1] - 16:3
**435** [2] - 16:7, 16:14
**4S** [1] - 63:6

## 5

**535** [1] - 15:16

## 6

**613-2538** [1] - 2:2
**66** [1] - 27:10
**6th** [2] - 6:5, 7:6

## 7

**7** [4] - 20:14, 20:16, 33:25, 58:15
**7.0** [2] - 63:6, 63:13
**70** [3] - 8:10, 58:7, 61:10
**70-cases** [1] - 24:19

**718** [1] - 2:2

## 8

**8** [4] - 20:25, 58:16, 63:1, 63:2
**8.1.2** [3] - 4:17, 33:20, 63:8
**8th** [1] - 43:21

## 9

**9** [3] - 3:12, 58:16, 63:3

## A

**a.m** [1] - 1:12
**ability** [3] - 16:23, 63:12, 63:13
**able** [6] - 4:5, 17:2, 34:1, 46:13, 59:16, 66:4
**abroad** [1] - 43:13
**absence** [1] - 50:8
**academic** [1] - 36:15
**accept** [1] - 37:12
**accepted** [1] - 61:23
**access** [13] - 10:8, 10:9, 10:10, 13:6, 16:10, 21:2, 50:25, 53:20, 63:13, 63:20, 64:25, 70:12
**accessed** [2] - 4:10, 32:1
**accessing** [4] - 59:20, 59:21, 60:11, 60:12
**accommodate** [1] - 7:20
**accompanied** [1] - 22:3
**accomplish** [1] - 57:10
**account** [1] - 15:4
**achieved** [1] - 37:3
**acknowledge** [2] - 11:20, 21:6
**act** [4] - 14:22, 16:19, 26:3
**Act** [62] - 15:5, 15:13, 15:22, 16:17, 17:20, 18:14, 18:22, 19:4, 19:8, 19:9, 19:10, 20:24, 26:13, 26:17, 26:22, 27:14, 28:1, 28:5, 28:9, 29:17, 30:3, 30:7, 31:16, 31:18, 31:20, 34:14, 35:8, 36:14, 36:17, 36:21, 37:10, 39:3, 43:13, 43:19, 44:21, 45:11, 48:4, 48:11, 49:11, 49:18, 51:14, 53:12, 53:16, 53:22, 57:14, 57:17, 58:24, 60:21, 62:1, 64:4, 64:6, 65:7, 66:14, 66:18, 68:20, 69:7, 69:14, 69:15, 70:1, 70:8, 70:12
**Act's** [1] - 18:23
**acted** [1] - 49:14
**action** [7] - 14:19, 15:3, 32:25, 39:6, 40:9, 41:2, 57:5
**actions** [1] - 41:8
**activated** [1] - 72:13
**active** [1] - 42:14
**activity** [1] - 54:16
**actor** [2] - 47:22, 53:5
**actual** [8] - 14:19, 15:7, 28:23, 30:17, 38:21, 41:15, 68:20, 69:1

**add** [2] - 11:7, 68:15
**additional** [1] - 72:6
**address** [7] - 17:3, 21:17, 54:7, 54:13, 58:9, 61:13, 62:19
**addressed** [2] - 21:24, 46:17
**addresses** [2] - 38:17, 38:18
**addressing** [2] - 38:23, 47:4
**administration** [1] - 66:10
**admissible** [1] - 32:9
**admittedly** [1] - 67:21
**advantageous** [2] - 66:23, 66:24
**advertisement** [2] - 66:3, 67:3
**advertising** [1] - 63:12
**advised** [1] - 72:10
**advocacy** [1] - 72:25
**affect** [1] - 14:6
**affects** [1] - 20:1
**affirmatively** [1] - 40:6
**afford** [1] - 4:22
**Affordable** [2] - 18:22, 18:23
**afforded** [1] - 28:8
**afraid** [1] - 69:22
**agencies** [3] - 6:25, 7:12, 35:3
**agency** [1] - 35:10
**agenda** [2] - 18:13, 20:5
**agent** [3] - 33:15, 59:2, 71:25
**agents** [4] - 4:4, 5:10, 6:9, 51:12
**ago** [6] - 5:13, 6:3, 9:15, 23:9, 36:17, 60:3
**agree** [6] - 6:15, 9:24, 37:16, 52:5, 63:17, 64:16
**agreeable** [4] - 37:3, 37:4, 38:11
**agreement** [3] - 17:15, 42:6, 42:8
**ahead** [5] - 20:20, 53:6, 61:9, 64:21, 67:18
**aid** [1] - 70:2
**aided** [1] - 2:4
**airplane** [1] - 6:9
**AL** [1] - 1:7
**alerted** [1] - 3:8
**Alito** [1] - 43:5
**allegation** [1] - 40:5
**allow** [6] - 4:1, 16:2, 26:17, 33:22, 67:13, 70:11
**allowing** [1] - 37:15
**allows** [3] - 29:23, 33:12, 35:7
**almost** [2] - 48:23, 66:3
**alone** [2] - 32:2, 33:12
**alternate** [1] - 62:13
**alternative** [1] - 62:16
**alternatives** [2] - 7:9, 19:22
**Ameet** [1] - 2:17
**AMEET** [1] - 1:20
**amended** [1] - 53:17
**amending** [1] - 53:8
**Amendment** [1] - 43:21
**amendments** [1] - 53:8
**American** [4] - 9:20, 11:8, 47:19
**Americans** [5] - 11:16, 12:1, 12:2,

13:9, 13:17

**amount** [1] - 70:11
**analogies** [1] - 42:25
**analogous** [2] - 54:4, 71:19
**analogy** [1] - 44:6
**analysis** [9] - 14:5, 15:25, 26:3, 26:6, 27:17, 30:12, 42:20, 43:17, 44:6
**analytic** [1] - 31:1
**analytically** [3] - 26:15, 26:22, 49:5
**anew** [1] - 43:15
**announce** [1] - 12:20
**announced** [1] - 13:3
**answer** [6] - 5:5, 23:25, 27:4, 28:19, 39:11, 60:19
**antiquated** [1] - 19:10
**anyway** [3] - 6:3, 26:9, 29:4
**apartment** [1] - 51:7
**apologize** [2] - 24:6, 47:9
**appeal** [1] - 10:19
**appearances** [1] - 2:13
**APPEARANCES** [1] - 1:16
**apple** [1] - 28:24
**APPLE** [1] - 1:4
**Apple** [111] - 1:22, 2:10, 2:21, 6:20, 7:14, 7:15, 7:18, 7:20, 7:23, 8:9, 8:12, 8:20, 8:22, 9:3, 9:10, 9:13, 9:14, 9:15, 10:6, 10:14, 10:20, 10:21, 10:23, 11:3, 11:10, 11:17, 12:10, 12:13, 12:18, 13:6, 13:9, 13:12, 13:24, 17:24, 20:16, 21:16, 23:7, 23:11, 24:7, 24:8, 24:23, 25:18, 28:22, 29:17, 29:21, 30:1, 30:18, 30:22, 31:11, 32:13, 32:14, 32:21, 32:25, 33:8, 33:23, 35:25, 39:22, 40:6, 41:1, 41:9, 41:12, 41:13, 41:16, 42:11, 42:17, 47:23, 48:15, 50:13, 50:17, 50:18, 52:12, 54:19, 54:20, 55:10, 55:12, 55:14, 55:16, 55:21, 55:22, 56:24, 57:1, 57:2, 57:3, 58:5, 58:11, 58:14, 58:16, 58:18, 58:19, 58:23, 58:24, 59:15, 59:18, 60:3, 60:10, 60:11, 62:2, 62:3, 62:5, 62:10, 62:17, 63:2, 63:19, 64:9, 64:16, 66:20, 67:20
**Apple's** [13] - 7:13, 8:5, 9:16, 9:18, 24:21, 25:5, 25:6, 25:9, 25:16, 29:12, 42:21, 59:19, 69:2
**applicability** [6] - 14:22, 26:8, 26:16, 27:19, 28:10, 31:3
**applicable** [1] - 43:20
**application** [11] - 5:17, 5:21, 5:24, 6:2, 9:6, 13:4, 20:14, 28:5, 31:16, 49:6, 70:5
**Application** [1] - 69:5
**applications** [2] - 55:25, 56:12
**applied** [1] - 8:3
**applies** [1] - 26:4
**apply** [3] - 20:24, 26:3, 65:7
**applying** [1] - 7:16
**appreciate** [4] - 3:2, 12:10, 47:4, 48:24
**approach** [2] - 37:11, 37:13
**appropriate** [2] - 27:17, 70:2
**area** [3] - 30:25, 43:20, 61:18

**argue** [1] - 64:11
**argued** [2] - 69:18, 69:20
**argument** [11] - 2:9, 11:15, 13:17, 13:20, 39:16, 39:20, 42:21, 61:15, 64:23, 66:3, 67:22
**ARGUMENT** [1] - 1:14
**arguments** [6] - 42:5, 50:15, 53:25, 59:4, 60:16, 68:9
**aside** [1] - 10:19
**assertion** [1] - 3:16
**ASSIST** [1] - 1:5
**assist** [8] - 8:10, 26:25, 38:25, 41:24, 52:11, 65:3, 69:5, 70:14
**Assist** [1] - 2:11
**assistance** [26] - 6:20, 7:11, 7:13, 8:2, 9:12, 9:14, 9:16, 12:15, 14:13, 24:7, 26:23, 27:15, 27:16, 28:8, 36:1, 49:13, 49:15, 50:3, 65:14, 68:20, 68:25, 69:8, 69:10, 70:19, 72:1
**assistant** [2] - 16:22, 33:18
**Assistant** [3] - 1:21, 2:17, 72:5
**assisting** [1] - 10:8
**assume** [4] - 6:17, 12:17, 16:16, 20:9
**assuming** [3] - 20:6, 42:19, 66:14
**AT&T** [1] - 21:9
**atmosphere** [1] - 10:1
**attached** [4] - 5:16, 5:20, 5:24, 6:1
**attack** [1] - 58:20
**attempted** [1] - 7:1
**attempting** [1] - 6:8
**attempts** [2] - 42:16, 72:13
**attention** [4] - 3:7, 3:15, 3:23, 4:21
**Attorney** [1] - 1:17
**Attorneys** [2] - 1:21, 2:18
**Attorneys'** [1] - 35:5
**AUSA** [1] - 72:21
**authenticate** [2] - 24:11, 32:7
**authentication** [2] - 63:25, 64:17
**authorities** [2] - 53:14, 66:23
**authority** [33] - 9:9, 9:10, 13:5, 16:1, 17:14, 17:20, 18:5, 18:10, 18:20, 19:5, 20:3, 29:20, 38:19, 50:9, 52:3, 55:12, 56:8, 57:15, 58:24, 60:22, 62:1, 65:10, 66:21, 67:4, 67:14, 67:20, 68:6, 68:20, 69:13, 69:15, 69:16, 70:12, 70:18
**authorization** [1] - 54:23
**authorize** [1] - 14:15
**authorized** [1] - 52:3
**availability** [1] - 44:21
**available** [14] - 7:9, 8:12, 26:10, 30:4, 31:4, 35:4, 42:18, 55:9, 55:23, 61:5, 61:11, 61:20, 61:22, 62:13
**aware** [10] - 12:17, 16:16, 16:18, 16:25, 58:11, 63:2, 63:3, 63:10, 63:11, 67:16

**B**

**back-door** [2] - 66:11, 66:16

**backdoor** [4] - 12:21, 12:23, 12:24, 13:21
**backdrop** [1] - 54:15
**background** [3] - 16:18, 20:7, 20:8
**badly** [1] - 38:9
**bag** [1] - 33:2
**balance** [1] - 53:19
**balk** [1] - 13:10
**ban** [1] - 14:13, 16:10
**bank** [2] - 40:23, 41:8
**bar** [2] - 55:6, 64:4
**bargain** [1] - 65:19
**bark** [1] - 58:8
**based** [8] - 8:13, 11:2, 12:8, 12:12, 33:24, 34:3, 45:21, 46:24
**basic** [5] - 3:15, 12:25, 13:19, 13:21, 13:23
**basis** [10] - 24:2, 40:25, 60:13, 60:14, 60:16, 60:23, 65:6, 69:15, 70:4, 70:7
**Battington** [2] - 27:21, 28:2
**become** [2] - 9:3, 59:11
**becomes** [1] - 60:20
**BEFORE** [1] - 1:14
**began** [1] - 6:9
**behalf** [2] - 34:4, 34:6
**belatedly** [1] - 49:2
**bells** [1] - 67:15
**best** [2] - 11:22, 11:24
**better** [4] - 13:2, 66:17, 66:20, 72:21
**between** [4] - 42:22, 44:9, 51:16, 53:19
**beyond** [3] - 21:1, 37:5, 57:21
**bi** [1] - 4:8
**bi-code** [1] - 4:8
**big** [2] - 58:6, 58:7
**bigger** [1] - 65:24
**biggest** [1] - 9:4
**bill** [8] - 16:1, 16:2, 17:13, 17:15, 17:18, 18:1, 18:12, 18:21
**bills** [8] - 14:18, 15:18, 16:9, 16:11, 17:6, 17:7, 18:19
**bit** [3] - 6:16, 10:13, 71:10
**blanking** [1] - 67:12
**block** [1] - 32:18
**blogs** [1] - 12:18
**Board** [2] - 27:9, 28:13
**board** [1] - 27:22
**boilerplate** [1] - 55:25
**boundaries** [1] - 37:22
**bounds** [1] - 52:6
**Bower** [1] - 33:15
**Brady** [1] - 35:17
**brand** [7] - 9:19, 11:10, 11:12, 12:6, 13:25, 14:2, 14:7
**break** [5] - 17:24, 25:14, 59:9, 62:18, 63:2
**brief** [9] - 3:19, 6:20, 6:24, 9:22, 10:3, 10:6, 32:21, 42:5, 66:2
**briefing** [4] - 2:25, 4:19, 7:20, 28:17
**briefly** [1] - 32:21

**briefs** [1] - 24:1
**bring** [4] - 3:7, 3:15, 3:22, 45:16
**brings** [1] - 3:16
**broad** [1] - 9:9
**broader** [1] - 66:8
**broadest** [1] - 34:5
**broadly** [2] - 3:20, 37:19
**broke** [1] - 63:6
**Brooklyn** [3] - 1:11, 1:18, 2:2
**brought** [1] - 69:12
**build** [1] - 52:10
**built** [2] - 58:14, 60:11
**burden** [32] - 8:17, 9:4, 11:4, 12:4, 12:6, 12:7, 13:13, 14:1, 19:22, 24:5, 25:11, 25:15, 26:6, 26:7, 26:18, 26:22, 27:17, 27:19, 30:22, 31:2, 35:25, 43:23, 47:17, 47:18, 53:23, 57:17, 59:5, 61:15, 64:12, 64:18, 71:7, 71:10
**burdens** [1] - 57:21
**burdensome** [3] - 30:1, 55:8, 65:24
**business** [9] - 26:10, 44:1, 51:9, 54:17, 59:19, 59:21, 59:22, 60:10, 62:7
**buy** [1] - 68:5
**buying** [1] - 66:3
**BY** [3] - 1:7, 1:19, 1:24
**bypass** [12] - 4:7, 6:11, 7:17, 25:21, 25:22, 29:22, 30:18, 39:4, 39:5, 46:25, 59:17, 69:1
**bypassing** [2] - 8:6, 41:24

### C

**cab** [1] - 27:23
**Cadman** [2] - 1:18, 2:1
**CALEA** [19] - 21:8, 21:9, 21:17, 21:18, 21:23, 22:3, 23:8, 37:19, 38:14, 38:17, 38:22, 52:5, 52:6, 52:8, 53:5, 53:7, 65:12, 65:18, 65:19
**Calea's** [2] - 21:13, 23:15
**cannot** [5] - 21:2, 34:16, 58:17, 58:18, 59:2
**capability** [5] - 9:10, 21:19, 30:17, 34:11, 34:25
**capable** [3] - 22:11, 39:5, 40:11
**CAPERS** [1] - 1:17
**capture** [1] - 26:12
**car** [1] - 27:23
**card** [10] - 31:21, 31:22, 31:23, 31:25, 32:1, 40:18, 40:21, 51:5, 51:6
**cards** [1] - 27:3
**care** [1] - 58:6
**Care** [2] - 18:22, 18:23
**carrier** [3] - 21:14, 22:7, 23:16
**carriers** [2] - 21:19, 22:4
**carry** [1] - 20:16
**carrying** [3] - 9:12, 21:12, 44:2
**carves** [1] - 37:21
**case** [57] - 3:11, 4:11, 4:14, 4:15, 4:16, 5:8, 6:25, 9:6, 9:16, 10:14, 10:16,

10:20, 18:1, 20:10, 25:13, 25:21, 26:23, 27:21, 33:18, 33:20, 35:3, 40:17, 40:18, 40:19, 40:20, 41:3, 41:13, 43:17, 45:21, 48:14, 49:4, 49:8, 49:15, 49:21, 50:1, 50:3, 50:11, 56:3, 62:23, 63:15, 64:10, 67:11, 69:12, 69:14, 69:18, 69:20, 69:23, 70:16, 70:21, 71:1, 71:12, 71:19, 72:3, 72:5, 72:11, 72:12
**cases** [20] - 15:23, 24:7, 24:20, 24:24, 25:4, 25:7, 25:18, 25:23, 26:13, 27:1, 27:2, 27:4, 27:8, 29:1, 43:6, 51:2, 51:14, 55:24, 69:4, 69:6
**cast** [1] - 39:20
**catch** [1] - 41:7
**categorical** [1] - 28:9
**categorically** [1] - 48:7
**category** [2] - 26:16, 26:18
**cell** [1] - 61:19
**cellphone** [1] - 41:17
**cellphones** [3] - 7:4, 7:6, 8:7
**cellular** [1] - 4:8
**cents** [1] - 47:22
**certain** [9] - 33:20, 33:22, 52:9, 57:2, 63:24, 64:25, 65:13, 70:11
**cetera** [1] - 19:23
**challenge** [3] - 56:15, 56:19, 60:3
**challenged** [2] - 55:10, 57:18
**challenging** [1] - 59:15
**chance** [3] - 50:13, 50:14, 72:16
**change** [1] - 48:20
**changes** [1] - 67:9
**characteristics** [1] - 26:12
**characterize** [1] - 68:24
**characterized** [1] - 28:21
**choose** [2] - 36:12, 36:23
**chosen** [1] - 65:17
**Circuit** [7] - 27:10, 28:12, 35:17, 49:4, 49:7, 49:8, 49:23
**circumstance** [1] - 71:22
**circumvent** [2] - 53:18, 53:22
**cited** [7] - 16:9, 16:20, 26:13, 27:2, 49:5, 51:15, 69:4
**cites** [6] - 15:19, 27:1, 27:8, 27:20, 49:16, 51:13
**citizen** [1] - 28:3
**citizens** [1] - 11:16
**civil** [1] - 2:9
**claim** [1] - 67:8
**clarify** [2] - 32:20, 62:20
**classic** [1] - 23:16
**clean** [1] - 31:1
**clear** [18] - 3:3, 4:15, 10:3, 16:21, 16:22, 17:17, 30:15, 57:3, 57:10, 59:8, 60:13, 60:14, 60:20, 60:22, 60:25, 62:1, 68:7, 69:25
**clearest** [2] - 27:21, 27:24
**clearly** [8] - 21:9, 27:18, 35:18, 37:22, 49:21, 55:5, 55:17, 64:5
**CLERK** [1] - 2:9

**close** [7] - 3:3, 38:23, 40:18, 43:23, 47:3, 64:3, 71:10
**closely** [4] - 39:18, 45:16, 46:5, 46:7
**code** [14] - 3:19, 4:5, 4:8, 4:9, 7:17, 25:14, 30:18, 39:4, 41:15, 42:14, 46:25, 72:7, 72:11
**codes** [1] - 4:2
**codified** [1] - 18:1
**cognizable** [1] - 14:19
**coherent** [2] - 38:1, 38:8
**colleague** [1] - 2:22
**colleagues** [2] - 3:8, 5:1
**combination** [1] - 29:5
**combined** [1] - 29:3
**command** [1] - 28:4
**commanding** [1] - 5:10
**comment** [6] - 11:8, 11:9, 11:10, 12:4, 56:20, 59:18
**commented** [1] - 15:17
**commerce** [1] - 51:10
**committee** [3] - 15:20, 16:12, 17:7
**common** [1] - 41:10
**communicated** [1] - 62:10
**communications** [8] - 21:20, 22:5, 22:9, 22:11, 51:22, 61:21, 61:24, 64:25
**community** [1] - 36:5
**companies** [3] - 9:21, 16:23, 43:6
**companion** [2] - 40:22, 41:6
**company** [29] - 9:4, 9:23, 11:9, 11:11, 13:6, 13:9, 14:3, 14:4, 17:2, 17:24, 31:21, 39:4, 43:4, 43:7, 43:24, 44:15, 44:16, 44:24, 45:1, 45:16, 45:25, 46:6, 47:19, 48:2, 51:5, 51:6, 58:6, 64:8, 69:5
**company's** [3] - 40:14, 41:11, 45:23
**comparable** [2] - 41:2, 41:9
**compel** [2] - 48:4, 48:6
**compelled** [6] - 43:12, 54:20, 55:15, 57:4, 57:11, 59:10
**compelling** [1] - 48:7
**compensation** [2] - 57:25, 58:2
**competing** [1] - 11:19
**complete** [1] - 6:10
**completely** [3] - 47:12, 48:23, 52:6
**complex** [1] - 51:7
**complicated** [2] - 30:25, 50:6
**complied** [2] - 8:11, 10:15
**complies** [1] - 12:10
**comply** [6] - 10:21, 10:24, 11:17, 60:12, 61:4, 62:8
**complying** [5] - 8:24, 12:14, 59:5, 61:6, 61:12
**comports** [1] - 19:11
**comprehensive** [5] - 25:1, 38:15, 38:18, 38:24, 65:12
**compromise** [1] - 58:21
**compromising** [1] - 54:11
**computer** [1] - 2:4
**computer-aided** [1] - 2:4
**concede** [1] - 43:20

conceived [1] - 69:9
concern [4] - 9:19, 18:24, 38:13, 48:19
concerned [1] - 48:18
concerns [2] - 30:23, 63:1
concession [1] - 57:14
concluded [1] - 73:16
conclusions [1] - 52:7
condone [1] - 11:11
conducting [1] - 39:5
confer [1] - 16:1
conferring [1] - 17:14
confidence [1] - 60:1
confidential [2] - 64:8, 64:14
configured [1] - 63:24
confusingly [1] - 27:20
Congress [51] - 13:5, 13:11, 14:12, 14:15, 15:8, 15:10, 15:15, 15:16, 15:25, 16:10, 16:13, 16:16, 16:25, 17:5, 17:13, 18:4, 18:8, 18:9, 18:19, 18:24, 19:5, 19:14, 19:17, 20:2, 20:4, 20:7, 20:23, 22:4, 36:18, 37:1, 37:14, 38:3, 38:7, 49:14, 51:18, 51:25, 52:2, 52:4, 53:7, 53:10, 53:15, 53:20, 64:23, 65:8, 65:10, 65:11, 65:17, 66:15, 66:23, 66:24
congressional [1] - 37:12
Congressional [17] - 14:17, 14:18, 14:24, 15:3, 16:3, 16:6, 17:18, 18:6, 18:17, 18:18, 21:4, 21:5, 39:6, 49:3, 49:20, 49:25, 65:5
connected [2] - 46:6, 46:7
connection [4] - 40:13, 40:19, 45:21, 71:11
connects [1] - 33:3
conscience [1] - 47:24
conscientious [2] - 48:5, 48:15
conscript [2] - 34:23, 60:23
conscripted [2] - 28:7, 37:23, 59:22
conscripting [2] - 27:22, 43:1
conscription [1] - 51:13
consider [8] - 8:1, 9:17, 20:3, 30:15, 47:11, 47:14, 48:12, 65:17
consideration [1] - 27:17
considered [1] - 60:15
considering [4] - 15:10, 18:19, 22:8, 45:12
consistency [1] - 57:20
consistent [5] - 28:6, 37:11, 38:5, 38:10, 56:24
conspiracy [1] - 5:11
constitutes [1] - 8:16
consult [2] - 36:5, 72:21
consulted [1] - 7:2
consumer [2] - 60:10, 61:3
consumer's [1] - 60:8
consumers [5] - 9:20, 11:8, 59:12, 60:1, 62:11
contacted [1] - 56:6
contained [1] - 4:3
contents [4] - 42:15, 51:22, 61:21,

61:24
context [4] - 39:3, 45:24, 45:25, 47:7
continually [1] - 8:25
continue [3] - 20:24, 37:15, 62:3
Continued [1] - 22:13
continues [1] - 52:14
continuing [1] - 60:12
control [3] - 51:1, 51:4, 51:8
controversy [1] - 55:5
conversation [1] - 13:2
conversations [1] - 7:23
cop [1] - 27:22
copied [1] - 4:10
copy [1] - 3:9
corporate [3] - 8:6, 11:16, 27:3
corporations [1] - 27:3
correct [10] - 5:13, 5:25, 8:18, 10:23, 15:2, 29:14, 32:24, 34:15, 64:1, 65:16
costs [1] - 58:7
counsel [5] - 2:21, 4:14, 8:12, 24:21, 69:1
count [1] - 25:1
counterfactual [1] - 71:7
country [1] - 8:14
couple [3] - 12:12, 30:14, 39:8
course [5] - 4:22, 5:5, 10:12, 51:8, 54:17
COURT [152] - 1:1, 1:7, 2:12, 2:19, 2:23, 5:7, 5:12, 5:16, 5:20, 5:23, 6:12, 6:15, 8:15, 9:22, 10:17, 10:25, 11:6, 11:13, 12:8, 12:20, 12:24, 13:22, 14:2, 14:5, 14:9, 14:20, 15:1, 15:8, 15:21, 17:10, 17:23, 18:11, 18:16, 18:24, 19:13, 20:17, 21:3, 21:11, 21:21, 23:1, 23:18, 23:23, 24:3, 24:22, 25:3, 25:11, 25:24, 27:6, 27:18, 28:14, 28:18, 28:20, 28:25, 29:7, 29:15, 29:23, 30:2, 30:9, 30:24, 31:9, 31:13, 32:5, 32:7, 32:17, 33:2, 33:5, 33:9, 33:13, 34:2, 34:8, 34:16, 34:18, 34:22, 35:5, 35:12, 35:16, 36:2, 36:7, 36:16, 37:17, 39:8, 39:11, 40:7, 40:23, 41:7, 41:12, 41:18, 41:25, 42:4, 42:24, 43:22, 44:11, 44:16, 45:2, 45:14, 46:3, 46:9, 46:12, 46:16, 46:19, 46:22, 47:1, 47:10, 47:15, 48:17, 48:21, 50:12, 50:18, 53:1, 53:6, 53:23, 54:8, 54:24, 55:17, 56:10, 57:12, 57:16, 58:3, 59:4, 59:24, 60:5, 60:14, 61:1, 62:12, 62:15, 62:21, 62:24, 63:7, 63:21, 64:3, 64:12, 64:18, 64:21, 65:22, 67:1, 67:11, 67:17, 68:8, 68:11, 68:15, 68:22, 69:17, 70:20, 71:6, 71:15, 71:18, 72:2, 72:15, 72:23, 73:7, 73:10, 73:12
court [40] - 5:9, 8:10, 9:13, 10:19, 10:20, 10:24, 16:24, 19:19, 21:1, 22:6, 29:16, 34:12, 45:17, 54:20, 55:1, 55:15, 55:16, 55:18, 56:3, 58:23, 59:18, 60:15, 60:20, 61:4, 61:22, 62:4, 65:21, 69:6, 69:10, 69:13, 69:14, 70:10, 70:13, 70:21, 70:22, 70:24, 71:3, 71:24, 72:8

Court [31] - 2:1, 5:5, 7:16, 7:18, 8:3, 8:7, 9:17, 10:15, 11:11, 14:11, 15:4, 15:18, 16:2, 17:2, 17:19, 19:25, 20:3, 20:18, 21:15, 24:1, 27:25, 28:21, 32:24, 36:8, 38:7, 44:12, 44:13, 50:21, 53:3, 69:18
court's [1] - 70:2
Court's [4] - 38:13, 38:25, 42:22, 68:19
Courthouse [1] - 1:10
courts [6] - 19:6, 19:18, 39:12, 55:14, 66:13
covered [1] - 21:9
covers [3] - 52:8, 64:6, 65:4
craft [1] - 57:22
create [2] - 9:10, 10:1
created [2] - 19:17, 40:2
credit [14] - 27:3, 31:21, 31:22, 31:23, 31:25, 32:1, 40:17, 40:21, 40:24, 41:5, 51:5, 51:6
crime [3] - 5:11, 36:6, 42:23
criminal [2] - 40:15, 41:11
cross [4:14, 40:12
cross-examination [1] - 4:14
crystal [2] - 5:11, 60:20
Cupertino [1] - 32:15
current [4] - 16:9, 18:20, 20:8, 20:9
cursory [1] - 12:18
curtails [1] - 30:8
custodian [1] - 31:25
custody [1] - 50:24
customer [5] - 58:11, 58:13, 58:22, 60:24, 62:7
customers [2] - 12:17, 59:6
customers' [2] - 59:20, 59:21
cut [1] - 62:1

**D**

daily [1] - 19:2
damage [2] - 11:10, 12:5
dare [1] - 34:7
dark [1] - 17:1
darn [1] - 58:6
data [17] - 4:3, 10:9, 12:8, 21:20, 28:23, 28:24, 52:8, 58:11, 58:13, 59:17, 59:20, 59:21, 60:11, 60:12, 61:20, 62:7, 70:18
date [1] - 6:6
dated [1] - 3:12
days [1] - 73:5
DC [1] - 1:23
DEA [6] - 3:18, 6:25, 33:25, 34:3, 35:4
death [4] - 43:11, 44:2, 44:9, 45:16
debate [18] - 10:12, 14:15, 15:16, 16:25, 17:5, 17:6, 20:24, 36:15, 53:10, 53:22, 64:24, 65:1, 65:2, 65:4, 66:8, 66:20, 66:25
debated [1] - 17:8
debates [1] - 16:12

**debating** [2] - 20:25, 53:8
**decide** [1] - 65:20
**decided** [2] - 36:20, 56:4
**decides** [1] - 43:4
**deciding** [1] - 15:5
**decision** [6] - 6:22, 13:3, 16:18, 65:6, 66:12, 73:12
**decisively** [1] - 15:25
**declarant** [1] - 63:4
**declarations** [1] - 25:20
**declaratory** [1] - 55:4
**decrypt** [5] - 16:23, 22:5, 22:7, 22:10, 57:1
**decrypting** [1] - 22:11
**decryption** [4] - 21:14, 21:24, 23:10
**defeat** [2] - 41:21, 72:18
**defeating** [1] - 72:17
**defendant** [4] - 40:21, 41:3, 41:13, 41:19
**defendant's** [3] - 4:5, 4:14, 7:5
**defined** [2] - 31:10, 37:22
**definitely** [1] - 20:18
**definition** [3] - 23:15, 37:6
**delegating** [1] - 20:3
**deletes** [1] - 42:15
**deliberately** [2] - 34:5, 44:19
**denied** [2] - 49:11, 69:13
**Department** [1] - 3:24
**deponent** [1] - 34:6
**deputy** [1] - 3:9
**desegregation** [1] - 27:12
**detail** [1] - 24:11
**determined** [3] - 7:12, 24:20
**develop** [2] - 45:1, 46:11
**developed** [1] - 17:5
**device** [14] - 4:9, 6:8, 17:2, 21:12, 23:17, 24:25, 30:18, 32:24, 33:12, 33:16, 50:24, 51:10, 57:1, 67:24
**devices** [10] - 5:19, 16:23, 20:16, 21:1, 54:12, 58:18, 58:22, 59:3, 59:17
**died** [1] - 15:20
**difference** [3] - 26:19, 26:21, 51:16
**different** [12] - 21:3, 35:19, 37:16, 44:6, 48:5, 48:7, 50:24, 52:6, 58:12, 60:5, 69:20, 71:5
**difficult** [1] - 46:4
**directions** [1] - 58:12
**directly** [2] - 70:1, 71:1
**director** [1] - 16:22
**disagree** [2] - 9:24, 55:8
**disagreeing** [1] - 49:19
**disclose** [3] - 29:18, 63:19, 64:8
**disclosed** [1] - 62:8
**discussed** [2] - 39:17, 40:16
**discussing** [2] - 62:12, 64:23
**discussion** [2] - 12:19, 53:17
**disobey** [1] - 28:3
**dispute** [1] - 42:10
**distinction** [1] - 50:2

**DISTRICT** [2] - 1:1, 1:1
**district** [1] - 3:12
**District** [4] - 35:5, 55:21, 69:4, 69:12
**diversion** [1] - 23:19
**Djibo** [5] - 3:14, 3:22, 4:11, 62:23, 72:5
**docket** [1] - 5:25
**doctrine** [1] - 65:5
**dog** [1] - 58:8
**dollars** [1] - 47:22
**done** [17] - 9:13, 11:3, 13:14, 14:5, 15:10, 15:15, 24:25, 38:3, 38:4, 40:2, 47:25, 49:10, 54:6, 54:21, 65:12, 66:23
**door** [2] - 66:11, 66:16
**doubt** [1] - 33:5
**down** [3] - 3:9, 66:22, 67:13
**draw** [4] - 48:1, 52:6, 67:5, 67:22
**drawer** [1] - 67:25
**drawing** [1] - 67:19
**drug** [6] - 43:15, 44:21, 45:1, 46:1, 47:2, 47:6
**Drug** [1] - 44:25
**drugs** [4] - 43:4, 43:7, 44:1, 48:2
**due** [1] - 18:25
**during** [1] - 9:2
**dwindling** [1] - 20:22

# E

**easier** [1] - 71:11
**easily** [4] - 18:8, 18:9, 21:6, 34:9
**East** [2] - 1:18, 2:1
**EASTERN** [1] - 1:1
**easy** [1] - 63:18
**Education** [2] - 27:10, 28:13
**effect** [1] - 18:23
**effective** [2] - 19:19, 19:21
**effectuate** [4] - 19:25, 36:1, 39:12, 69:8
**eight** [1] - 20:18
**either** [4] - 25:1, 26:17, 49:18, 59:22
**Elbert** [1] - 2:17
**ELBERT** [1] - 1:20
**electronic** [2] - 6:7, 37:20
**element** [3] - 39:17, 43:24, 45:18
**elements** [1] - 45:19
**email** [2] - 6:1, 8:21
**emphasize** [1] - 50:20
**employee** [1] - 9:5
**enabled** [2] - 42:14, 42:16
**encompass** [1] - 53:9
**encrypted** [1] - 22:5
**encryption** [7] - 13:7, 21:13, 22:1, 22:7, 37:21, 40:4, 41:21
**end** [4] - 10:20, 30:12, 35:24, 42:6
**ended** [1] - 70:22
**enforcement** [14] - 12:15, 40:20, 47:20, 52:2, 52:11, 54:10, 56:7, 56:23, 59:2, 59:17, 59:23, 64:25, 65:3, 65:14
**engage** [2] - 20:4, 21:14

**ensured** [1] - 19:18
**entangled** [1] - 68:1
**enter** [2] - 4:9, 7:1
**enterprise** [1] - 40:15
**entire** [3] - 35:23, 53:22, 65:2
**entirety** [1] - 50:8
**entity** [1] - 11:21
**entry** [1] - 4:8
**escape** [1] - 41:1
**especially** [2] - 48:25, 56:11
**ESQ** [2] - 1:24, 1:25
**essence** [1] - 22:8
**essential** [1] - 69:6
**essentially** [4] - 15:14, 32:18, 51:11, 67:12
**established** [1] - 8:23
**establishes** [2] - 30:9, 45:21
**estimates** [1] - 8:9
**estoppel** [1] - 11:2
**ET** [1] - 1:7
**et** [1] - 19:23
**event** [2] - 3:25, 29:4
**evidence** [7] - 5:11, 6:7, 12:9, 13:13, 14:1, 36:19, 42:23
**evolve** [1] - 61:19
**evolves** [1] - 61:25
**ex** [2] - 54:22, 54:25
**exact** [4] - 8:12, 16:10, 45:3, 52:1
**exactly** [8] - 10:16, 11:5, 28:4, 29:21, 57:6, 57:23, 69:13, 72:17
**examination** [1] - 4:14
**example** [11] - 8:5, 15:25, 18:21, 24:21, 25:14, 27:21, 27:24, 31:20, 37:19, 39:14, 51:4
**examples** [1] - 18:18
**exception** [2] - 23:10, 55:20
**excuse** [1] - 36:9
**execute** [3] - 7:10, 29:12, 43:9
**executed** [6] - 6:6, 42:13, 42:23, 44:8
**executing** [2] - 7:7, 8:2
**Execution** [1] - 2:11
**execution** [5] - 6:7, 38:25, 42:17, 43:8, 45:16
**EXECUTION** [1] - 1:5
**executions** [1] - 44:20
**executive** [1] - 16:22
**exempted** [1] - 21:24
**exhausted** [1] - 48:23
**exhaustive** [1] - 50:6
**Exhibit** [1] - 5:24
**exist** [1] - 63:16
**existing** [2] - 29:23, 43:14
**exists** [1] - 70:3
**expanded** [1] - 4:12
**expands** [1] - 3:19
**expansive** [1] - 43:21
**expect** [5] - 7:22, 9:20, 11:8, 11:16, 34:9
**expedite** [1] - 23:6

**expedited** [1] - 6:21
**expense** [1] - 57:21
**expert** [4] - 4:12, 50:23, 59:1, 63:5
**expired** [3] - 5:12, 6:3, 6:16
**explain** [1] - 32:1
**Explain** [1] - 59:24
**explained** [2] - 4:12, 57:18
**explains** [1] - 54:8
**explanation** [1] - 72:18
**explicitly** [4] - 16:1, 36:25, 38:7, 39:22
**explore** [2] - 7:9, 10:13
**expressed** [1] - 39:6
**expressly** [1] - 14:13
**extend** [1] - 68:7
**extending** [3] - 40:23, 41:4, 41:5
**extensive** [2] - 25:22, 50:5
**extent** [3] - 25:7, 38:4, 47:16
**extracting** [2] - 28:23, 28:24
**extractions** [1] - 24:25

## F

**F2D** [1] - 27:10
**face** [1] - 36:19
**facetiously** [1] - 66:7
**facilities** [10] - 26:11, 29:3, 29:6, 32:13, 32:15, 40:14, 45:23, 46:1, 50:25, 51:3
**facility** [3] - 27:13, 48:6, 71:12
**fact** [20] - 8:15, 16:8, 16:19, 17:5, 17:7, 20:13, 32:23, 36:6, 38:18, 40:16, 43:5, 43:22, 53:25, 56:5, 56:7, 56:13, 56:18, 57:9, 57:14, 58:14
**factors** [4] - 14:6, 43:18, 45:12
**factual** [1] - 71:21
**failed** [4] - 3:18, 21:22, 42:16, 72:13
**fair** [8] - 6:23, 15:9, 17:19, 23:22, 36:21, 37:1, 48:19, 68:23
**fairly** [1] - 69:25
**fall** [3] - 26:16, 26:18
**falls** [1] - 26:22
**familiar** [2] - 18:25, 43:21
**fanciful** [2] - 43:2, 43:3
**far** [9] - 14:17, 15:15, 15:21, 15:24, 17:11, 24:16, 48:11, 64:23, 68:7
**Faraday** [1] - 32:16
**FBI** [7] - 3:18, 6:25, 7:3, 16:21, 33:24, 34:3, 35:3
**feasible** [1] - 30:20
**feature** [4] - 4:2, 41:15, 42:15, 72:12
**features** [1] - 46:1
**federal** [16] - 5:9, 9:13, 10:11, 19:17, 19:18, 19:19, 29:19, 32:3, 36:4, 40:20, 42:13, 55:16, 70:24, 71:12, 71:14
**Federal** [3] - 38:24, 42:22, 46:11
**few** [9] - 14:18, 15:16, 15:17, 20:14, 20:15, 24:19, 36:17, 55:19
**fewer** [1] - 44:17
**fight** [2] - 61:5, 61:12

**fighting** [1] - 47:3
**figure** [2] - 26:7, 65:8
**filing** [1] - 36:14
**fill** [3] - 38:4, 53:12, 65:21
**filling** [1] - 65:9
**fills** [1] - 15:6
**fine** [4] - 20:10, 47:12, 49:22, 60:17
**finely** [1] - 35:16
**finish** [1] - 6:13
**first** [21] - 2:24, 5:18, 7:1, 7:15, 8:21, 12:13, 21:8, 30:15, 39:16, 39:24, 43:24, 44:3, 45:18, 45:19, 47:5, 47:6, 54:15, 57:17, 66:19, 67:2, 68:19
**five** [1] - 3:23
**floor** [1] - 16:12
**focus** [2] - 10:3, 51:15
**folks** [1] - 2:24
**follow** [6] - 8:2, 27:23, 33:17, 50:11, 59:11, 72:8
**followed** [3] - 9:6, 72:4, 72:17
**following** [1] - 58:10
**follows** [1] - 11:12
**Food** [1] - 44:25
**force** [3] - 17:23, 37:13, 58:24
**forced** [5] - 58:25, 59:1, 59:2, 62:3, 63:23
**forcing** [2] - 21:13, 64:7
**foreclosed** [1] - 53:24
**forensic** [6] - 4:1, 4:12, 53:14, 59:1, 63:5, 63:12
**forensics** [1] - 51:13
**forget** [1] - 3:25
**forgive** [1] - 10:17
**forgotten** [1] - 17:25
**form** [2] - 10:8, 29:16
**forma** [1] - 56:12
**forth** [1] - 25:19
**forums** [1] - 12:19
**forward** [4] - 39:25, 40:25, 41:2, 58:17
**foster** [1] - 54:10
**foundational** [1] - 19:11
**four** [2] - 15:18
**frames** [1] - 40:13
**frankly** [1] - 28:7
**frequency** [1] - 57:9
**front** [2] - 37:2, 57:24
**frontier** [1] - 53:13
**frustrate** [1] - 44:19
**frustrated** [1] - 51:25
**fugitive** [2] - 40:24, 40:25, 41:5
**fully** [1] - 40:16
**fundamentally** [1] - 36:13
**futile** [1] - 56:2
**future** [2] - 20:25, 63:16

## G

**gambit** [1] - 27:2
**game** [4] - 15:9, 17:19, 36:21, 37:1

**gap** [4] - 14:14, 15:5, 36:14, 53:11
**gaps** [1] - 38:4
**Gene** [1] - 2:1
**given** [5] - 17:4, 20:5, 32:24, 52:10, 56:14
**glad** [1] - 69:11
**gorilla** [1] - 43:6
**governed** [1] - 39:3
**Government** [26] - 1:17, 24:16, 25:13, 29:19, 30:20, 32:4, 33:22, 34:3, 34:6, 34:10, 34:16, 35:1, 35:19, 35:20, 35:23, 36:10, 43:8, 45:5, 46:11, 46:12, 46:19, 46:23, 51:3, 51:11, 51:18, 51:22
**government** [55] - 2:14, 3:10, 3:16, 3:19, 3:20, 3:23, 6:19, 6:24, 7:8, 7:14, 7:15, 7:24, 8:3, 8:14, 9:15, 10:21, 11:22, 12:20, 12:25, 13:3, 13:10, 13:20, 14:13, 14:16, 15:22, 16:17, 16:24, 17:23, 19:23, 53:13, 53:15, 53:19, 53:21, 54:2, 60:23, 61:21, 61:22, 62:17, 63:18, 63:19, 64:16, 65:25, 66:6, 66:14, 66:15, 67:4, 67:6, 67:13, 68:1, 68:6, 69:25, 70:9, 70:17, 71:25
**Government's** [1] - 50:24
**government's** [4] - 4:12, 8:2, 9:6, 61:9
**Grand** [6] - 29:20, 30:11, 30:14, 30:16, 30:21, 31:25
**grant** [3] - 17:19, 61:9, 70:4
**granted** [3] - 52:4, 66:21, 68:6
**grants** [1] - 18:10
**great** [1] - 73:10
**greater** [2] - 51:20, 51:21
**grown** [3] - 9:3, 14:3, 14:4
**guess** [1] - 37:17
**guidance** [2] - 8:22, 15:24
**guidelines** [2] - 7:25, 9:1
**guys** [1] - 73:8

## H

**habeas** [2] - 71:1, 71:2
**Hall** [3] - 40:17, 40:23, 45:23
**halves** [1] - 26:2
**hand** [3] - 3:9, 25:18, 36:17
**handle** [1] - 3:2
**handled** [1] - 72:5
**happy** [8] - 4:19, 5:5, 10:7, 23:25, 48:12, 50:11, 50:16, 73:1
**hard** [7] - 19:7, 44:5, 45:10, 47:10, 54:4, 61:14, 67:5
**Haute** [1] - 43:10
**head** [1] - 60:8
**headquarters** [1] - 32:15
**hear** [5] - 3:6, 4:20, 50:13, 50:15, 50:16
**heard** [4] - 5:1, 15:17, 63:11, 63:14
**hearing** [2] - 3:11, 72:9
**hearings** [2] - 16:19, 16:21
**heart** [1] - 14:21

**held** [1] - 43:13
**help** [7] - 9:25, 11:14, 12:3, 21:6, 43:9, 47:20, 54:9
**helped** [1] - 3:2
**helpful** [3] - 3:1, 10:1, 72:25
**helping** [1] - 41:3
**helps** [1] - 12:10
**herring** [1] - 42:7
**hesitate** [1] - 44:6
**higher** [2] - 10:19, 30:22
**historically** [1] - 70:9
**history** [1] - 54:1
**home** [2] - 5:19, 7:5
**Homeland** [2] - 3:24
**honest** [1] - 44:4
**Honor** [45] - 2:15, 2:20, 5:3, 6:23, 10:6, 10:23, 11:5, 11:8, 12:5, 13:20, 14:8, 14:25, 16:5, 16:8, 16:20, 18:7, 20:21, 21:10, 23:13, 24:15, 29:14, 30:1, 30:13, 31:17, 32:12, 32:20, 34:7, 36:4, 39:10, 44:4, 46:21, 47:13, 48:13, 50:16, 50:19, 58:10, 64:20, 68:13, 68:17, 69:11, 69:22, 70:25, 71:20, 72:4, 73:11
**HONORABLE** [1] - 1:14
**hope** [2] - 20:17, 67:17
**hours** [1] - 25:22
**House** [2] - 18:21, 22:2
**HSI** [3] - 3:24, 3:25, 4:4
**hurt** [3] - 13:14, 13:25, 14:3
**hypo** [1] - 47:4
**hypothetical** [7] - 17:21, 35:10, 46:22, 47:13, 48:10, 60:8, 60:9

---

## I

**idea** [2] - 12:25, 28:7
**identified** [2] - 11:20, 24:17
**identify** [1] - 11:22
**ignore** [1] - 36:7
**Ill** [5] - 21:20, 22:10, 50:3, 50:4, 67:8
**illegal** [1] - 45:24
**immediate** [1] - 57:21
**impact** [1] - 11:12
**imperil** [4] - 59:11, 60:18, 61:3, 61:14
**imperils** [1] - 61:11
**implemented** [1] - 67:9
**implicate** [1] - 25:8
**implicated** [1] - 25:5
**implicates** [1] - 59:5
**implied** [2] - 38:22, 39:6
**import** [1] - 43:13
**importance** [1] - 20:23
**important** [8] - 5:8, 7:15, 11:25, 14:21, 51:16, 56:21, 58:13, 71:21
**impose** [1] - 25:16
**impractical** [1] - 37:10
**improper** [2] - 10:9, 10:10
**IN** [1] - 1:5
**inaction** [5] - 15:3, 37:12, 49:3, 49:25,

---

65:5
**INC** [1] - 1:4
**Inc** [2] - 2:10, 55:21
**include** [1] - 51:23
**included** [2] - 51:20, 51:23
**includes** [1] - 38:10
**including** [2] - 4:13, 37:15
**independent** [2] - 33:23, 63:13
**indicate** [1] - 56:13
**indicated** [1] - 9:15
**indicating** [1] - 55:14
**indication** [2] - 51:18, 63:11
**individuals** [1] - 27:4
**indulged** [1] - 48:25
**industry** [1] - 37:20
**infer** [1] - 38:2
**inference** [1] - 38:20
**inflammatory** [2] - 47:14, 48:10
**influences** [1] - 18:25
**information** [30] - 23:7, 23:11, 23:15, 25:8, 26:9, 27:6, 27:7, 27:13, 28:23, 28:25, 29:2, 29:6, 29:7, 29:11, 29:13, 29:18, 31:14, 41:6, 48:6, 53:2, 64:5, 68:21, 68:25, 69:2, 69:7, 69:9, 70:11, 70:13, 70:15, 72:6
**informative** [1] - 2:25
**informed** [1] - 33:21
**informing** [1] - 8:25
**infringe** [1] - 25:16
**initial** [2] - 8:9, 8:13
**initiate** [1] - 6:7
**initiates** [1] - 72:13
**injection** [2] - 43:4, 44:15
**inserted** [1] - 39:19
**inside** [1] - 53:1
**insight** [1] - 11:4
**insisted** [1] - 7:25
**instance** [2] - 24:17, 71:4
**instances** [1] - 61:10
**instead** [1] - 47:3
**instruct** [1] - 70:14
**instruction** [1] - 64:2
**Intel** [1] - 34:10
**intelligence** [1] - 36:5
**intend** [1] - 3:8
**intended** [4] - 32:21, 45:20, 51:18, 65:11
**intending** [1] - 38:3
**intent** [3] - 19:8, 45:15, 51:25
**intentionally** [2] - 48:1, 48:9
**intercept** [1] - 21:19
**intercepted** [1] - 22:9
**interest** [1] - 11:19
**interesting** [2] - 24:15, 35:9
**interests** [5] - 11:23, 25:5, 25:9, 25:17, 55:18
**internal** [1] - 32:2
**internet** [1] - 33:3
**interpretation** [1] - 38:21

---

**interpretive** [1] - 36:24
**interrupting** [1] - 10:18
**interstitial** [1] - 65:9
**intervening** [1] - 18:14
**introduce** [1] - 25:10
**introductory** [1] - 5:4
**intuitive** [1] - 24:9
**investigate** [1] - 36:5
**investigation** [7] - 12:11, 33:24, 39:23, 40:1, 40:3, 40:8, 46:24
**invitation** [1] - 61:7
**invited** [3] - 55:16, 55:18, 59:18
**invoke** [2] - 9:8, 57:16
**involve** [3] - 25:21, 32:16, 51:3
**involved** [6] - 6:25, 33:19, 58:18, 67:21, 67:23
**involves** [2] - 27:9, 40:20
**involving** [1] - 30:1
**IOS** [14] - 4:17, 20:14, 20:16, 20:25, 33:19, 33:23, 33:25, 58:15, 58:16, 63:1, 63:2, 63:3, 63:6
**iPhone** [5] - 3:17, 4:3, 4:6, 4:16, 63:6
**ironic** [1] - 59:13
**irrelevant** [1] - 13:21
**issuance** [2] - 6:6, 69:25
**issue** [29] - 3:17, 3:21, 6:21, 7:5, 9:25, 12:3, 12:22, 17:1, 20:12, 20:15, 20:22, 20:25, 25:4, 25:7, 25:24, 29:20, 34:8, 35:8, 36:20, 37:18, 38:17, 38:23, 39:7, 40:12, 53:23, 56:4, 56:14, 64:15, 65:21
**ISSUED** [1] - 1:7
**issued** [7] - 5:9, 5:15, 6:5, 9:12, 19:19, 44:10
**issues** [7] - 3:3, 10:13, 14:21, 19:20, 20:6, 57:15, 69:6
**issuing** [1] - 31:20
**items** [1] - 73:2
**iterations** [1] - 38:18
**itself** [6] - 13:1, 14:1, 25:5, 50:4, 58:19, 60:12

---

## J

**jail** [1] - 60:18
**JAMES** [1] - 1:14
**Jeffrey** [1] - 2:22
**JEFFREY** [1] - 1:25
**job** [1] - 45:4
**Johnson** [1] - 3:11
**joined** [2] - 2:17, 2:21
**joke** [1] - 35:14
**JUDGE** [1] - 1:15
**Judge** [4] - 3:11, 69:17, 69:22, 73:15
**judges** [1] - 56:9
**judgment** [1] - 55:4
**Judiciary** [1] - 19:10
**judiciary** [1] - 20:4
**July** [4] - 3:12, 6:5, 6:19, 7:6
**jumping** [1] - 48:25

jurisdiction [2] - 70:3
jurisdictional [3] - 55:6, 70:4, 70:7
Jury [6] - 29:20, 30:11, 30:14, 30:16, 30:21, 31:25
jury [1] - 44:10
Justice [3] - 43:5, 69:18, 69:21
justification [1] - 64:10

**K**

Kabrawala [1] - 2:17
KABRAWALA [1] - 1:20
keep [4] - 26:7, 31:1, 55:3, 68:8
keeps [1] - 26:6
key [1] - 38:16
kill [1] - 48:3
kin [1] - 40:11
kind [6] - 12:8, 21:12, 24:10, 28:4, 54:9, 56:14
kinds [2] - 28:8, 37:14
knowledge [2] - 20:7, 33:19
KOMATIREDDY [110] - 1:19, 2:15, 5:3, 5:8, 5:14, 5:18, 5:22, 6:5, 6:14, 6:23, 8:18, 10:5, 11:5, 11:7, 12:4, 12:12, 12:22, 13:19, 13:23, 14:4, 14:8, 14:11, 14:25, 15:7, 15:14, 16:5, 17:21, 18:7, 18:15, 18:17, 19:9, 19:16, 20:21, 21:10, 21:17, 22:2, 23:13, 23:22, 23:25, 24:15, 26:21, 27:7, 28:13, 28:16, 28:19, 28:21, 29:5, 29:14, 29:19, 29:25, 30:6, 30:13, 31:6, 31:12, 31:17, 32:6, 32:12, 33:7, 33:11, 33:17, 34:7, 34:15, 34:17, 34:20, 35:2, 35:9, 35:15, 35:24, 36:3, 36:13, 37:9, 38:13, 39:10, 40:5, 40:10, 41:4, 41:10, 41:14, 41:23, 42:2, 42:11, 43:16, 44:4, 44:14, 44:23, 45:7, 45:20, 46:4, 46:10, 46:15, 46:17, 46:21, 46:24, 47:9, 47:13, 48:12, 48:18, 50:1, 50:16, 68:17, 68:23, 70:6, 70:25, 71:9, 71:17, 71:20, 72:4, 72:20, 73:5, 73:15
Komatireddy [7] - 2:16, 4:25, 25:24, 52:12, 62:12, 63:1, 64:1
Komatireddy's [1] - 64:22

**L**

labor [1] - 69:9
lack [1] - 49:20
LANDIS [1] - 1:25
Landis [1] - 2:22
language [16] - 7:24, 8:4, 17:14, 17:22, 34:5, 56:21, 56:22, 57:2, 57:8, 57:14, 57:16, 57:19, 57:22, 57:24, 59:9, 69:25
larger [1] - 18:1
last [10] - 12:13, 15:22, 17:10, 39:11, 43:4, 43:7, 44:16, 49:2, 70:20
LAUREN [1] - 1:20
Lauren [1] - 2:17

Law [1] - 43:21
law [48] - 11:12, 11:17, 12:10, 12:15, 14:14, 15:7, 15:8, 16:8, 18:9, 20:8, 20:9, 26:23, 30:4, 35:17, 37:3, 37:4, 38:11, 38:12, 38:17, 39:7, 40:20, 41:1, 43:20, 44:23, 44:25, 45:22, 47:20, 48:20, 52:1, 52:11, 53:11, 53:12, 54:10, 56:7, 56:23, 59:2, 59:10, 59:11, 59:17, 59:22, 60:23, 61:18, 61:19, 61:25, 64:24, 65:3, 65:14
lawful [8] - 10:15, 43:11, 44:2, 45:17, 60:13, 60:14, 60:16, 62:8
lawyers [1] - 69:20
leading [1] - 66:21
learned [1] - 4:18
least [6] - 8:10, 12:2, 18:21, 39:21, 71:13, 72:6
leaves [1] - 38:19
leaving [1] - 10:18
left [2] - 17:9, 39:7
legal [15] - 7:24, 9:1, 9:8, 9:25, 10:4, 10:8, 12:3, 18:20, 24:2, 37:13, 54:15, 62:16, 64:9, 70:17
legally [5] - 14:19, 53:24, 63:21, 63:22, 64:3
legislates [1] - 20:7
legislation [10] - 12:21, 13:21, 15:11, 17:3, 17:16, 38:5, 49:10, 49:20, 66:11, 66:16
legislative [3] - 19:5, 38:15, 38:16
length [2] - 9:22, 40:18
lesser [1] - 51:23
lethal [1] - 43:4
letter [4] - 3:10, 3:12, 3:23, 73:2
letters [1] - 73:4
letting [1] - 29:6
level [4] - 15:3, 24:11, 56:11, 62:16
licences [1] - 41:16
license [2] - 42:6, 42:7
lies [1] - 61:9
light [1] - 59:14
likelihood [1] - 71:23
limit [2] - 27:15, 28:9
limited [1] - 56:1
limits [1] - 15:13
line [3] - 67:5, 67:19, 68:3
lines [1] - 31:1
list [1] - 15:23
litigation [1] - 32:8
location [1] - 41:6
lock [4] - 41:15, 41:24, 42:14, 65:18
locked [4] - 8:7, 12:15, 67:22, 67:25
locksmith [1] - 43:2
logs [1] - 51:4
long-standing [1] - 8:6
look [21] - 11:15, 13:8, 13:13, 13:16, 16:19, 27:18, 28:14, 30:25, 34:9, 35:16, 36:18, 36:22, 43:19, 43:24, 44:11, 56:10, 57:16, 65:11, 65:24, 69:3, 71:21

looking [4] - 23:14, 37:10, 38:14, 49:9
loop [1] - 64:3
lose [2] - 39:9, 60:1
losing [1] - 26:7
loudly [1] - 15:4

**M**

magistrate [1] - 56:11
MAGISTRATE [1] - 1:15
magistrates [1] - 55:13
main [1] - 68:19
majority [1] - 24:6
managed [1] - 25:9
manner [2] - 8:11, 45:1
manual [1] - 64:2
manufacture [2] - 21:11, 43:14
manufacturers [1] - 23:17
MARC [1] - 1:24
Marc [1] - 2:21
market [1] - 13:15
marketing [1] - 47:21
Marshal [1] - 70:23
marshals [1] - 72:1
Marshals [5] - 30:3, 30:7, 31:4, 70:21, 71:13
materials [1] - 3:22
matter [7] - 13:12, 20:4, 32:23, 38:20, 47:21, 47:24, 73:16
matters [1] - 6:16
MC [1] - 1:18
mean [9] - 30:17, 34:25, 39:19, 45:24, 46:12, 58:5, 59:8, 64:13, 70:8
meaning [3] - 23:7, 49:19, 49:24
meaningless [1] - 14:24
means [2] - 62:13, 63:15
mechanical [1] - 43:4
mechanism [3] - 62:7, 63:2, 63:18
members [1] - 15:16
mentioned [1] - 51:2
mere [1] - 61:20
meth [1] - 5:11
method [1] - 63:19
middle [1] - 58:19
might [3] - 32:7, 46:12, 62:13
mind [9] - 3:4, 17:4, 19:24, 23:2, 24:22, 38:1, 49:21, 64:19, 66:1
minimal [1] - 9:5
minute [2] - 36:9, 60:3
minutes [1] - 36:17
Miscellaneous [1] - 2:10
mischaracterizing [1] - 15:1
missing [1] - 50:9
mistaken [3] - 4:17, 23:9, 57:24
mode [1] - 6:9
modifying [1] - 67:7
moment [3] - 23:9, 47:9, 68:10
monitoring [1] - 69:6

**monopoly** [1] - 43:25
**moot** [1] - 23:1
**morning** [4] - 2:12, 2:15, 2:20, 2:23
**most** [5] - 5:8, 14:21, 51:16, 64:8, 64:14
**motion** [2] - 21:20, 61:9
**move** [1] - 14:9
**moving** [1] - 20:2
**MR** [43] - 2:20, 10:23, 24:23, 25:6, 25:15, 32:20, 33:4, 50:19, 53:3, 53:7, 54:7, 54:13, 55:10, 56:5, 56:20, 57:13, 58:1, 58:9, 59:13, 60:2, 60:9, 60:19, 61:17, 62:14, 62:19, 62:22, 62:25, 63:10, 63:22, 64:7, 64:13, 64:20, 64:22, 66:19, 67:2, 67:16, 67:19, 68:10, 68:13, 69:11, 69:24, 73:9, 73:11
**MS** [109] - 2:15, 5:3, 5:8, 5:14, 5:18, 5:22, 6:5, 6:14, 6:23, 8:18, 10:5, 11:5, 11:7, 12:4, 12:12, 12:22, 13:19, 13:23, 14:4, 14:8, 14:11, 14:25, 15:7, 15:14, 16:5, 17:21, 18:7, 18:15, 18:17, 19:9, 19:16, 20:21, 21:10, 21:17, 22:2, 23:13, 23:22, 23:25, 24:15, 26:21, 27:7, 28:13, 28:16, 28:19, 28:21, 29:5, 29:14, 29:19, 29:25, 30:6, 30:13, 31:6, 31:12, 31:17, 32:6, 32:12, 33:7, 33:11, 33:17, 34:7, 34:15, 34:17, 34:20, 35:2, 35:9, 35:15, 35:24, 36:3, 36:13, 37:9, 38:13, 39:10, 40:5, 40:10, 41:4, 41:10, 41:14, 41:23, 42:2, 42:11, 43:16, 44:4, 44:14, 44:23, 45:7, 45:20, 46:4, 46:10, 46:15, 46:17, 46:21, 46:24, 47:9, 47:13, 48:12, 48:18, 50:1, 50:16, 68:17, 68:23, 70:6, 70:25, 71:9, 71:17, 71:20, 72:4, 72:20, 73:5, 73:15
**multiple** [1] - 56:9
**must** [3] - 10:20, 60:15, 70:3

## N

**narrow** [2] - 64:24, 70:17
**narrower** [1] - 66:2
**narrowly** [1] - 36:18
**nature** [4] - 25:4, 26:23, 27:15, 27:16
**navigate** [1] - 34:9
**necessarily** [3] - 27:12, 47:23, 56:13
**necessary** [4] - 19:25, 36:1, 36:8, 70:2
**necessity** [2] - 36:2, 36:3
**need** [11] - 6:21, 23:6, 30:25, 32:5, 32:7, 32:10, 34:18, 50:1, 53:3, 54:2, 55:17
**needed** [1] - 19:20
**needn't** [1] - 19:1
**needs** [3] - 23:4, 53:10, 53:20
**negative** [1] - 11:12
**negotiating** [1] - 25:20
**never** [9] - 8:11, 15:19, 52:2, 54:19, 56:18, 58:1, 58:12, 59:20, 65:10
**nevertheless** [1] - 4:5

**new** [10] - 9:8, 9:9, 53:13, 59:3, 66:4, 66:21, 66:22, 67:3, 68:5
**NEW** [1] - 1:1
**New** [27] - 1:11, 2:2, 26:4, 26:19, 26:24, 27:1, 27:5, 27:8, 27:20, 27:24, 39:17, 39:21, 40:13, 43:18, 43:24, 45:18, 45:22, 47:6, 47:17, 49:5, 49:16, 51:17, 51:20, 54:16, 67:22, 69:3, 71:8
**newer** [1] - 66:5
**next** [3] - 18:12, 22:13, 52:14
**Nickerson** [2] - 69:17, 69:22
**nine** [1] - 20:19
**Ninth** [4] - 49:4, 49:6, 49:8, 49:23
**nobody** [1] - 47:2
**normal** [2] - 51:8, 54:17
**note** [5] - 5:23, 7:4, 7:15, 21:22, 48:14
**note-taking** [1] - 21:22
**noted** [1] - 6:24
**notes** [1] - 24:4
**nothing** [4] - 18:19, 40:7, 55:25, 67:24
**notice** [1] - 33:17
**noting** [1] - 8:20
**notion** [1] - 11:11
**number** [6] - 4:25, 8:12, 8:13, 18:18, 20:5, 24:22
**NW** [1] - 1:23
**NY** [1] - 1:18

## O

**o'clock** [1] - 1:12
**Oakland** [1] - 55:23
**objected** [1] - 8:11
**objection** [3] - 48:5, 48:15, 48:16
**obligation** [8] - 21:25, 22:10, 35:17, 36:4, 52:10, 55:2, 59:10, 60:17
**obligations** [1] - 21:25
**observation** [1] - 14:12
**obsolete** [1] - 20:15
**obtain** [4] - 4:3, 4:6, 70:11, 70:18
**obtained** [1] - 16:24
**obtaining** [3] - 16:17, 69:8, 70:14
**obvious** [2] - 50:9, 68:3
**obviously** [2] - 18:24, 64:6
**October** [2] - 1:12, 6:19
**odds** [1] - 19:6
**OF** [3] - 1:1, 1:6, 1:14
**offensive** [1] - 54:18
**offered** [1] - 56:22
**office** [3] - 35:6, 35:12, 35:19
**old** [1] - 59:3
**once** [3] - 4:9, 7:12, 62:2
**one** [61] - 3:7, 3:17, 4:25, 5:15, 5:16, 5:20, 7:19, 7:21, 11:7, 14:10, 14:21, 15:11, 16:20, 17:10, 17:16, 17:24, 21:3, 24:5, 26:3, 26:15, 27:8, 29:3, 34:12, 36:17, 36:23, 37:1, 37:2, 38:16, 38:19, 39:14, 40:16, 41:14, 42:25, 43:3, 44:8, 44:18, 45:11, 49:2, 54:25, 55:20, 55:22,

56:20, 56:22, 57:4, 59:4, 59:9, 61:18, 62:16, 65:17, 66:2, 66:7, 67:3, 67:23, 68:10, 69:3, 69:18, 69:19, 70:10, 70:20, 73:4
**ongoing** [3] - 8:13, 40:15, 55:5
**onwards** [1] - 26:24
**open** [1] - 34:11
**operates** [2] - 20:9, 42:12
**operating** [7] - 20:10, 33:21, 40:2, 41:15, 42:22, 58:14, 58:16
**opinion** [1] - 15:19
**opportunity** [2] - 4:22, 10:13
**opposed** [5] - 28:7, 31:23, 31:24, 35:17, 72:1
**opposite** [2] - 28:4, 52:1
**oral** [1] - 2:9
**order** [38] - 7:9, 7:18, 8:1, 8:3, 8:7, 10:20, 10:24, 16:24, 17:2, 21:1, 27:9, 27:11, 29:17, 31:20, 35:8, 36:5, 44:7, 44:12, 44:13, 45:12, 45:17, 52:2, 54:20, 55:11, 57:3, 59:5, 61:4, 61:5, 61:12, 61:22, 64:5, 64:6, 64:11, 67:8, 69:8, 70:1, 71:24
**ORDER** [1] - 1:4
**Order** [1] - 2:10
**ordered** [4] - 22:6, 25:12, 59:25, 68:2
**ordering** [2] - 21:15, 62:17
**orders** [26] - 8:10, 10:15, 12:14, 12:16, 16:18, 19:18, 19:19, 19:25, 54:25, 55:13, 55:14, 55:19, 55:25, 56:6, 56:12, 56:19, 56:23, 56:24, 57:15, 60:4, 60:13, 62:8, 66:18, 69:5, 69:7, 70:9
**ORENSTEIN** [1] - 1:14
**organized** [1] - 36:10
**original** [1] - 49:13
**orthodoxy** [1] - 61:23
**otherwise** [4] - 17:18, 22:12, 44:22, 50:9
**ourselves** [1] - 36:10
**outset** [1] - 50:2
**outside** [3] - 52:6, 52:13, 53:5
**outstripped** [1] - 19:3
**overall** [2] - 38:5, 49:9
**override** [1] - 4:2
**owes** [1] - 41:16
**own** [11] - 7:2, 20:5, 21:22, 26:10, 33:19, 42:3, 46:11, 46:13, 46:23, 51:12, 59:22
**owner** [1] - 41:16
**owns** [1] - 42:12

## P

**page** [3] - 3:23, 22:13, 52:14
**pains** [1] - 59:8
**parallels** [1] - 48:1
**parents** [2] - 27:9, 27:11
**parse** [1] - 16:4
**part** [12] - 3:16, 16:20, 18:1, 26:6,

27:18, 27:19, 40:14, 46:4, 47:18, 57:5, 69:9, 71:14
**parte** [2] - 54:22, 54:25
**particular** [11] - 20:12, 20:22, 27:11, 33:19, 33:23, 38:19, 39:3, 46:25, 69:8, 71:22, 71:24
**particularly** [1] - 45:9
**parties** [6] - 27:1, 37:22, 38:25, 39:13, 42:8, 63:12
**partly** [1] - 49:14
**parts** [1] - 19:10
**party** [7] - 7:11, 26:24, 29:2, 34:23, 39:15, 51:8, 70:14
**party's** [1] - 51:4
**pass** [16] - 3:19, 4:2, 4:5, 7:17, 16:8, 25:14, 30:18, 37:14, 39:4, 41:15, 42:13, 42:14, 46:25, 71:7, 72:7, 72:11
**passed** [13] - 16:11, 17:8, 17:16, 18:21, 19:9, 19:13, 19:14, 38:17, 44:3, 49:14, 53:17, 65:8
**passes** [1] - 18:2
**passing** [1] - 15:8
**password** [4] - 6:11, 13:6, 17:25, 21:13
**past** [8] - 11:2, 13:6, 16:22, 17:7, 24:25, 55:5, 59:15, 61:15
**path** [3] - 31:4, 31:6, 59:24
**patient** [1] - 50:18
**patriotic** [1] - 10:2
**patriotism** [3] - 9:23, 10:5, 11:9
**pause** [1] - 68:12
**Pause** [1] - 47:8
**paying** [1] - 60:17
**pejoratively** [1] - 39:20
**pen** [2] - 51:24
**pending** [1] - 32:19
**Pennsylvania** [4] - 30:2, 30:6, 31:3, 70:21
**people** [8] - 12:9, 16:4, 16:7, 16:14, 25:1, 25:7, 47:19, 48:3
**per** [1] - 8:19
**perceived** [2] - 11:10, 56:16
**percent** [1] - 58:18
**perception** [2] - 48:19, 48:20
**perform** [5] - 51:12, 54:21, 57:4, 58:18, 65:19
**performing** [2] - 51:24
**perhaps** [4] - 24:20, 29:17, 38:20, 46:14
**period** [1] - 8:23
**permit** [2] - 31:7, 45:11
**person** [4] - 40:21, 40:24, 41:8, 63:5
**personal** [1] - 33:19
**personally** [2] - 63:6, 72:8
**personnel** [1] - 71:3
**perspective** [1] - 25:6
**phone** [21] - 3:21, 5:10, 7:1, 7:13, 29:8, 29:18, 31:14, 32:11, 33:25, 42:3, 42:15, 46:25, 51:5, 62:18, 63:9, 63:13, 63:15,

66:5, 67:13, 68:5, 69:5
**phones** [7] - 7:7, 12:15, 17:24, 59:9, 66:4, 66:6, 67:3
**phrased** [1] - 38:9
**picture** [2] - 58:7, 65:25
**place** [5] - 23:20, 26:7, 49:1, 50:5, 53:15
**placing** [1] - 6:9
**plainly** [1] - 9:4
**plans** [1] - 61:8
**play** [1] - 56:7
**Plaza** [2] - 1:18, 2:1
**plenty** [1] - 56:11
**point** [26] - 11:7, 13:19, 13:21, 13:23, 14:10, 19:17, 20:21, 42:11, 43:25, 44:17, 46:18, 47:21, 47:22, 57:8, 58:5, 60:25, 61:14, 63:25, 64:14, 65:7, 66:9, 66:19, 67:2, 67:19, 71:2, 71:4
**points** [5] - 23:24, 50:20, 52:12, 68:14, 68:18
**policy** [1] - 44:19
**pops** [1] - 50:2
**posed** [1] - 17:12
**posited** [1] - 62:4
**positing** [1] - 47:1
**position** [15] - 9:17, 9:18, 11:22, 11:24, 12:5, 24:12, 39:22, 39:25, 45:3, 53:4, 58:17, 58:20, 59:16, 62:9, 62:11
**possession** [3] - 4:1, 51:1, 51:7
**possibility** [3] - 10:19, 34:10, 40:3
**possible** [5] - 36:15, 38:18, 40:25, 47:3, 72:11
**possibly** [1] - 42:16
**potential** [1] - 44:9
**power** [6] - 51:19, 51:21, 51:23, 53:21
**powers** [4] - 19:7, 19:12, 20:1
**practical** [4] - 36:14, 37:10, 37:11, 37:13
**practically** [1] - 36:22
**practice** [10] - 8:6, 8:25, 11:2, 12:14, 12:16, 16:7, 16:17, 16:25, 17:8, 72:21
**precedent** [2] - 31:19, 51:14
**preliminary** [1] - 17:6
**prepare** [1] - 25:7
**presence** [1] - 50:6
**pressed** [1] - 11:21
**pretend** [1] - 72:17
**pretty** [2] - 15:23, 58:6
**prevent** [2] - 21:15, 60:11
**preventing** [1] - 42:12
**primarily** [1] - 7:1
**principles** [4] - 37:4, 37:18, 37:25, 38:11
**prioritization** [1] - 20:5
**prioritize** [1] - 20:11
**priority** [1] - 73:4
**prisoner** [2] - 70:23, 71:12, 71:25
**privacy** [5] - 9:21, 53:19, 54:11, 58:13, 58:21

**private** [3] - 11:21, 28:3, 47:22
**pro** [1] - 56:12
**problem** [1] - 47:10
**problems** [2] - 65:10, 67:4
**procedure** [4] - 8:23, 9:7, 29:23, 30:4
**proceeding** [2] - 54:22
**Proceedings** [1] - 2:4
**proceedings** [1] - 54:25
**process** [12] - 7:6, 7:23, 7:25, 8:20, 9:1, 25:22, 28:23, 29:16, 60:7, 62:17, 66:24, 69:1
**processing** [2] - 8:24, 9:3
**produce** [1] - 31:24
**produced** [1] - 2:4
**product** [3] - 67:10, 67:21, 67:23
**proffer** [1] - 69:24
**prohibit** [3] - 16:7, 17:8, 17:22
**prohibited** [2] - 37:1, 38:7
**prohibiting** [2] - 15:9, 16:8
**prohibition** [2] - 15:12, 38:22
**promote** [1] - 12:11
**prong** [5] - 26:5, 36:2, 36:3, 47:6, 67:22
**prongs** [1] - 71:8
**propose** [1] - 59:9
**proposed** [6] - 14:18, 15:18, 16:9, 17:7, 19:4
**proposition** [1] - 3:17
**proprietary** [2] - 25:9, 25:16
**prosecuting** [1] - 35:3
**prosecution** [2] - 34:21, 34:22
**prosecutors** [5] - 8:14, 24:16, 24:18, 35:3, 36:4
**prospect** [1] - 25:12
**prospective** [1] - 22:9
**prospectively** [2] - 41:3, 41:8
**protect** [1] - 9:21
**provide** [14] - 9:16, 13:6, 15:23, 21:25, 28:16, 53:14, 58:24, 62:1, 64:1, 65:13, 69:15, 70:11, 70:12, 72:6
**provided** [7] - 2:25, 7:24, 8:22, 9:14, 22:7, 57:19, 69:16
**provider** [5] - 21:14, 21:25, 22:10, 54:17, 54:18
**providers** [7] - 52:9, 53:10, 53:14, 63:12, 65:2, 65:13
**provides** [3] - 27:16, 57:15, 60:21
**providing** [9] - 12:14, 41:13, 43:7, 50:23, 50:25, 52:9, 54:8, 64:24, 67:25
**provision** [5] - 18:1, 21:13, 21:23, 22:2, 71:2
**public** [8] - 8:25, 12:16, 13:25, 23:16, 44:19, 48:19, 66:20, 66:25
**publicly** [1] - 55:23
**published** [1] - 12:13
**publishing** [1] - 9:1
**Puerto** [2] - 69:4, 69:12
**purpose** [1] - 45:25
**purposefully** [1] - 47:15

**purposes** [4] - 26:10, 26:19, 34:13, 43:23
**pushing** [1] - 53:12
**put** [4] - 4:20, 24:12, 51:10, 61:14
**puts** [3] - 19:5, 37:21, 58:16
**putting** [1] - 11:13

## Q

**qualify** [1] - 23:11
**query** [1] - 8:13
**questioning** [1] - 9:23
**questions** [13] - 3:5, 4:25, 5:5, 21:8, 23:23, 24:1, 26:15, 27:5, 39:8, 45:10, 47:10, 48:23, 56:25
**quick** [1] - 3:1
**quickly** [1] - 73:13
**quite** [2] - 66:7, 66:9
**quo** [3] - 16:15, 17:9, 37:15
**quoted** [1] - 8:21

## R

**raise** [1] - 6:18
**rather** [2] - 72:18, 73:4
**Re** [2] - 2:10, 69:5
**re** [1] - 43:13
**re-import** [1] - 43:13
**reached** [3] - 7:14, 7:15, 66:8
**read** [5] - 16:13, 37:7, 56:18, 69:23, 72:16
**reading** [4] - 36:25, 49:18, 50:7, 69:13
**readings** [1] - 69:20
**realistic** [1] - 25:12
**realize** [1] - 20:8
**really** [18] - 3:2, 8:17, 9:25, 10:3, 13:14, 21:5, 27:2, 35:7, 36:19, 45:4, 47:4, 48:21, 49:5, 49:17, 55:7, 60:5, 65:24, 72:25
**realtime** [2] - 21:19, 22:8
**reason** [11] - 3:22, 9:18, 13:1, 16:6, 20:11, 23:8, 33:5, 37:12, 40:12, 44:5, 72:12
**reasonable** [9] - 7:9, 12:17, 16:16, 18:23, 19:21, 20:9, 20:23, 35:4, 38:20
**reasonably** [1] - 16:13
**reasons** [6] - 12:25, 16:14, 36:11, 37:14, 56:22, 57:19
**received** [2] - 8:10, 55:11
**receiving** [1] - 55:13
**recent** [2] - 14:15, 43:6
**recently** [2] - 19:14, 66:9
**record** [5] - 8:21, 17:17, 32:4, 62:20, 68:18
**recorded** [1] - 2:4
**records** [13] - 4:6, 4:10, 27:3, 31:21, 31:23, 31:24, 32:1, 32:5, 32:8, 40:18, 40:21, 50:25, 51:3

**recounted** [1] - 6:20
**red** [1] - 42:7
**referred** [2] - 15:20, 43:5
**refund** [1] - 49:11
**refused** [1] - 14:15
**regard** [1] - 62:22
**regime** [1] - 18:3
**register** [2] - 51:24, 51:25
**regression** [1] - 14:5
**regularly** [1] - 55:13
**regulates** [1] - 37:19
**regulating** [1] - 42:8
**rehearse** [1] - 19:1
**reject** [1] - 15:25
**rejected** [1] - 16:3
**related** [5] - 21:8, 29:15, 39:18, 57:1, 65:23
**relation** [1] - 71:13
**relationship** [2] - 43:23, 59:6
**relatively** [1] - 50:6
**release** [1] - 43:14
**relevance** [1] - 42:9
**relevant** [3] - 42:11, 43:19, 44:25
**relief** [3] - 7:16, 35:20, 49:6
**relieve** [1] - 55:2
**rely** [2] - 24:1, 66:13
**remain** [1] - 16:15
**remarks** [1] - 5:4
**remember** [1] - 5:9
**remind** [1] - 65:22
**reminded** [2] - 39:11, 69:17
**remote** [5] - 32:16, 32:17, 32:22, 32:23, 42:18
**renewed** [1] - 6:17
**reopen** [1] - 66:15
**repeal** [1] - 18:22
**repeatedly** [1] - 56:6
**Reporter** [1] - 2:1
**reports** [1] - 22:3
**represent** [2] - 40:10, 72:7
**representation** [11] - 33:6, 33:7, 34:2, 34:4, 34:6, 34:13, 34:18, 34:20, 35:7, 35:20, 35:22
**represented** [2] - 42:18, 69:1
**representing** [1] - 45:4
**represents** [1] - 9:17
**reputation** [1] - 9:5
**reputational** [2] - 12:7, 14:1
**request** [12] - 6:17, 8:2, 9:11, 32:18, 32:22, 32:23, 39:4, 49:12, 54:3, 72:1, 73:5
**requested** [3] - 8:1, 38:19, 70:1
**requesting** [6] - 10:16, 14:14, 14:16, 16:10, 17:22
**requests** [3] - 8:24, 9:3, 32:16
**require** [11] - 13:5, 13:11, 44:24, 45:1, 49:15, 53:14, 57:23, 57:25, 68:20, 69:10, 70:22
**required** [20] - 7:25, 24:10, 24:11,

24:18, 24:24, 26:25, 53:5, 56:15, 56:25, 57:6, 57:7, 58:1, 61:24, 62:9, 65:3, 65:13, 65:19, 69:2, 70:23, 71:3
**requirement** [1] - 4:8
**requires** [5] - 21:18, 21:21, 45:12, 63:24, 64:16
**Requiring** [1] - 2:10
**REQUIRING** [1] - 1:4
**requiring** [8] - 8:7, 8:10, 10:15, 27:9, 27:11, 38:25, 39:14, 50:3
**research** [1] - 13:15
**resolve** [2] - 9:25, 69:21
**resolved** [2] - 24:8, 24:20
**resources** [1] - 9:5
**respect** [1] - 37:20
**respects** [1] - 37:21
**respond** [1] - 49:22
**response** [2] - 49:15, 68:16
**responsibility** [2] - 10:7, 22:5
**responsible** [2] - 8:6, 35:18
**responsive** [1] - 48:24
**restricts** [1] - 23:16
**result** [4] - 10:20, 15:11, 54:23, 66:23
**retain** [1] - 21:19
**return** [1] - 43:17
**reveal** [2] - 24:13, 25:14
**reversal** [2] - 9:18, 9:19
**review** [3] - 50:1, 50:11, 64:23
**reviewed** [1] - 45:22
**revised** [1] - 7:20
**revisiting** [1] - 19:2
**Rico** [2] - 69:4, 69:12
**rid** [1] - 32:17
**rights** [2] - 9:24, 56:16
**ring** [1] - 67:14
**road** [1] - 66:22
**ROBERT** [1] - 1:17
**robust** [1] - 66:20
**role** [1] - 65:2
**room** [2] - 32:16, 33:2
**routine** [2] - 9:7, 9:11
**routinely** [1] - 8:23
**Rudolph** [1] - 2:1
**Rule** [4] - 30:9, 30:10, 69:16, 70:7
**ruled** [1] - 69:14
**run** [1] - 27:2
**running** [4] - 4:16, 27:22, 63:6

## S

**safe** [1] - 43:1
**safety** [1] - 9:21
**salient** [1] - 20:25
**SARITHA** [1] - 1:19
**Saritha** [1] - 2:16
**satisfied** [1] - 45:17
**satisfy** [2] - 45:18, 47:5
**saw** [1] - 57:3
**scenario** [3] - 17:12, 47:1, 47:7

**schedule** [3] - 3:1, 7:20, 73:1
**scheduling** [1] - 23:5
**scheme** [9] - 38:16, 38:24, 39:12, 50:7, 50:8, 50:10, 65:9, 65:12
**school** [1] - 27:12
**scope** [3] - 52:13, 53:1, 53:5
**se** [1] - 8:19
**search** [25] - 5:10, 5:12, 5:14, 5:15, 5:18, 6:8, 6:10, 7:5, 7:7, 7:10, 9:12, 10:11, 12:16, 12:18, 16:24, 19:20, 19:21, 29:12, 39:1, 42:17, 54:23, 70:18
**Search** [1] - 2:11
**SEARCH** [1] - 1:6
**searching** [1] - 42:25
**second** [9] - 23:1, 26:3, 30:21, 51:16, 57:19, 66:7, 66:19, 70:13, 72:2
**Second** [1] - 35:17
**secret** [4] - 9:8, 24:13, 30:22, 64:15
**secrets** [1] - 64:9
**Security** [1] - 3:24
**security** [3] - 4:2, 58:13, 58:21
**see** [6] - 20:21, 26:19, 26:21, 55:24, 61:1, 61:11
**seeing** [1] - 20:13
**seek** [6] - 9:9, 12:21, 13:5, 17:14, 55:4, 56:15
**seeking** [8] - 12:21, 18:22, 35:19, 52:2, 66:10, 67:5, 67:20, 68:6
**seeks** [2] - 10:21, 15:22
**seem** [2] - 61:3, 68:3
**seized** [1] - 7:4
**sell** [1] - 66:6
**Senate** [1] - 22:3
**send** [2] - 27:11, 71:25
**sense** [6] - 24:9, 36:11, 37:24, 48:10, 65:25, 66:2
**sensitive** [1] - 23:5
**sentence** [5] - 43:11, 44:2, 44:9, 44:12, 45:16
**separate** [6] - 12:22, 18:12, 25:24, 70:4, 70:6, 70:17
**separation** [3] - 19:7, 19:11, 20:1
**September** [1] - 3:13
**seriously** [1] - 10:7
**servers** [3] - 29:12, 63:25, 69:2
**service** [12] - 11:21, 23:7, 23:11, 23:15, 28:7, 39:14, 41:12, 48:4, 48:8, 53:2, 60:24, 63:12
**Service** [1] - 70:23
**services** [19] - 22:1, 24:12, 40:14, 41:11, 41:12, 41:14, 50:23, 51:13, 52:10, 53:9, 53:14, 54:21, 57:4, 57:6, 58:19, 59:1, 65:20, 67:25, 68:21
**set** [3] - 51:17, 67:12, 73:1
**setting** [1] - 20:5
**settled** [2] - 56:8
**seven** [1] - 12:13
**several** [4] - 14:12, 25:21, 44:25, 55:3
**share** [1] - 12:1

**short** [4] - 15:8, 15:14, 41:20, 41:23
**shown** [1] - 14:15
**shows** [1] - 13:14
**side** [3] - 34:10, 73:2, 73:4
**sides** [4] - 3:5, 4:22, 23:3, 72:25
**siege** [1] - 58:12
**signed** [1] - 56:12
**significant** [1] - 25:19
**signing** [1] - 25:20
**silence** [12] - 14:24, 16:3, 17:19, 18:6, 18:17, 18:18, 21:4, 21:5, 45:2, 45:3, 49:20
**silent** [1] - 36:19
**simple** [2] - 9:11, 18:20
**simply** [6] - 3:20, 16:7, 26:24, 27:15, 40:1, 44:8
**simultaneous** [1] - 73:3
**site** [1] - 61:20
**sitting** [1] - 67:24
**situation** [5] - 21:18, 28:22, 52:1, 54:4, 71:24
**situations** [2] - 26:25, 71:22
**skip** [1] - 24:6
**skipped** [1] - 50:12
**slice** [2] - 35:16, 56:1
**slightly** [1] - 21:3
**slipped** [1] - 64:19
**slowly** [1] - 20:2
**so-called** [1] - 17:1
**societal** [2] - 65:2, 66:8
**software** [11] - 4:7, 4:15, 4:16, 21:12, 29:22, 42:3, 42:4, 42:12, 42:21, 67:7
**sold** [2] - 41:19, 41:21
**solved** [1] - 68:4
**someone** [1] - 46:6
**somewhat** [7] - 3:1, 27:20, 56:8, 59:13, 61:23, 65:23, 66:9
**son** [1] - 27:11
**soon** [1] - 10:3
**sorry** [6] - 28:11, 41:23, 44:11, 54:24, 60:16, 67:17
**sort** [14] - 8:17, 11:1, 21:12, 23:8, 26:2, 28:4, 28:9, 39:20, 48:25, 49:9, 53:24, 59:24, 66:2
**sorts** [3] - 12:14, 26:25, 66:22
**sought** [1] - 13:21
**sounds** [1] - 31:15
**Southern** [2] - 35:5, 55:20
**speaking** [1] - 3:20
**speaks** [1] - 15:4
**specialized** [1] - 4:7
**specific** [9] - 7:24, 23:14, 24:17, 30:4, 32:14, 33:21, 39:6, 43:22, 50:9
**specifically** [2] - 21:24, 31:10
**specify** [2] - 26:23, 27:15
**speculation** [1] - 63:3
**spirit** [1] - 37:24
**spot** [1] - 4:20
**square** [1] - 49:24

**squarely** [1] - 19:5
**squares** [1] - 19:8
**stake** [1] - 55:18
**stand** [3] - 10:9, 40:8, 66:10
**standardized** [1] - 57:8
**standing** [2] - 8:6, 71:15
**stands** [4] - 3:25, 9:23, 42:21, 42:22
**start** [2] - 5:2, 15:16
**started** [3] - 3:6, 6:12, 17:13
**starting** [1] - 4:24
**state** [5] - 32:24, 49:10, 55:15, 71:3, 71:12
**statements** [2] - 14:17, 14:18
**states** [4] - 10:6, 18:10, 22:4
**STATES** [2] - 1:1, 1:15
**States** [10] - 1:10, 1:17, 2:16, 2:18, 3:13, 34:25, 40:17, 45:22, 49:6, 71:13
**statue** [1] - 53:8
**status** [3] - 16:15, 17:9, 37:15
**statute** [19] - 23:12, 28:2, 30:8, 30:9, 36:14, 37:2, 37:7, 38:2, 38:8, 38:10, 38:21, 49:13, 50:4, 50:5, 65:15, 71:1, 71:2, 71:4, 71:6
**statutes** [2] - 19:2, 37:15
**statutory** [11] - 15:12, 18:3, 23:14, 31:4, 31:6, 37:5, 38:20, 38:24, 50:6, 50:8, 50:10
**stays** [1] - 67:21
**stenography** [1] - 2:4
**step** [2] - 44:3, 44:8
**steps** [5] - 55:8, 61:5, 61:11, 61:16, 68:2
**still** [12] - 16:3, 17:16, 17:18, 18:2, 18:6, 18:14, 25:19, 30:19, 35:6, 42:14, 57:18, 60:16
**stipulations** [1] - 25:20
**stock** [1] - 43:14
**stop** [2] - 43:5, 67:6
**stops** [2] - 67:5, 68:3
**store** [1] - 32:14
**stored** [1] - 4:6
**stream** [1] - 51:10
**Street** [1] - 1:23
**strip** [1] - 17:15
**stripped** [1] - 18:2
**struck** [2] - 42:6, 65:19
**struggling** [1] - 25:25
**stunning** [1] - 9:18
**subject** [4] - 4:3, 4:6, 16:12, 22:6
**submission** [1] - 23:4
**submit** [2] - 4:22, 55:16
**subpoena** [10] - 29:16, 29:20, 29:21, 31:18, 31:22, 31:25, 61:20, 61:22, 62:16, 64:4
**subset** [1] - 52:3
**successfully** [1] - 63:8
**sufficient** [3] - 12:25, 32:3, 60:23
**sufficiently** [4] - 46:5, 67:21, 67:23, 68:1

**suggest** [1] - 32:21
**suggested** [1] - 56:2
**suggesting** [1] - 49:9
**suggestion** [1] - 10:6
**suggestions** [1] - 43:1
**supplement** [2] - 28:19, 68:18
**supplemental** [1] - 23:4
**support** [1] - 12:18
**suppose** [2] - 3:20, 71:23
**supposed** [1] - 69:21
**Supreme** [1] - 69:18
**surely** [1] - 51:23
**surprised** [2] - 10:14, 34:11
**surprising** [2] - 9:22, 28:2
**surprisingly** [1] - 13:3
**surveillance** [3] - 9:9, 37:20, 51:6
**survey** [2] - 8:13, 24:16
**suspect** [1] - 32:15
**system** [13] - 32:2, 32:3, 32:4, 33:21, 33:25, 40:2, 41:15, 58:14, 60:11, 63:1, 63:24, 64:16, 71:14
**systems** [2] - 58:15, 58:16

**T**

**table** [1] - 2:22
**talks** [2] - 40:18, 72:16
**tap** [4] - 49:13, 50:4, 51:22
**tapes** [2] - 27:4, 51:6
**target** [1] - 33:25
**task** [1] - 37:23
**team** [2] - 34:21, 34:22
**technical** [8] - 30:17, 37:18, 62:16, 68:25, 69:7, 70:19, 72:18
**technically** [2] - 63:21, 63:23
**technicians** [1] - 4:2
**technologies** [1] - 33:22
**technology** [9] - 4:1, 7:2, 19:3, 32:12, 32:13, 33:10, 35:6, 46:13, 72:10
**Tel** [16] - 26:4, 26:19, 27:20, 27:25, 39:21, 40:13, 43:24, 45:18, 45:22, 47:6, 47:17, 49:5, 49:16, 54:16, 67:22, 71:8
**telecom** [4] - 21:14, 21:25, 49:12, 49:15
**telecommunications** [3] - 21:18, 22:4, 23:16
**Telephone** [8] - 26:24, 27:1, 27:8, 39:17, 43:18, 51:17, 51:20, 69:3
**telephone** [1] - 4:8
**template** [1] - 9:7
**ten** [5] - 7:4, 7:6, 38:18, 42:15, 72:13
**tendentious** [1] - 11:13
**terms** [16] - 9:4, 12:6, 15:10, 25:11, 25:25, 30:22, 35:12, 37:7, 37:9, 39:12, 39:20, 40:11, 42:8, 43:22, 57:17, 72:20
**Terre** [1] - 43:9
**test** [4] - 26:5, 47:5, 47:6, 71:7
**testifies** [1] - 33:16
**testify** [9] - 24:8, 24:10, 24:18, 24:24,
25:2, 25:8, 25:19, 25:23, 31:23
**testifying** [1] - 63:5
**testimony** [15] - 3:11, 3:12, 4:11, 15:17, 16:20, 16:21, 25:4, 25:10, 32:2, 32:8, 33:12, 63:4, 72:15, 72:16
**text** [3] - 37:5, 37:8, 38:8
**textbook** [1] - 8:5
**THE** [154] - 1:5, 1:7, 1:14, 2:9, 2:12, 2:19, 2:23, 5:7, 5:12, 5:16, 5:20, 5:23, 6:12, 6:15, 8:15, 9:22, 10:17, 10:25, 11:6, 11:13, 12:8, 12:20, 12:24, 13:22, 14:2, 14:5, 14:9, 14:20, 15:1, 15:8, 15:21, 17:10, 17:23, 18:11, 18:16, 18:24, 19:13, 20:17, 21:3, 21:11, 21:21, 23:1, 23:18, 23:23, 24:3, 24:22, 25:3, 25:11, 25:24, 27:6, 27:18, 28:14, 28:18, 28:20, 28:25, 29:7, 29:15, 29:23, 30:2, 30:9, 30:24, 31:9, 31:13, 32:5, 32:7, 32:17, 33:2, 33:5, 33:9, 33:13, 34:2, 34:8, 34:16, 34:18, 34:22, 35:5, 35:12, 35:16, 36:2, 36:7, 36:16, 37:17, 39:8, 39:11, 40:7, 40:23, 41:7, 41:12, 41:18, 41:25, 42:4, 42:24, 43:22, 44:11, 44:16, 45:2, 45:14, 46:3, 46:9, 46:12, 46:16, 46:19, 46:22, 47:1, 47:10, 47:15, 48:17, 48:21, 50:12, 50:18, 53:1, 53:6, 53:23, 54:8, 54:24, 55:17, 56:10, 57:12, 57:16, 58:3, 59:4, 59:24, 60:5, 60:14, 61:1, 62:12, 62:15, 62:21, 62:24, 63:7, 63:21, 64:3, 64:12, 64:18, 64:21, 65:22, 67:1, 67:11, 67:17, 68:8, 68:11, 68:15, 68:22, 69:17, 70:20, 71:6, 71:15, 71:18, 72:2, 72:15, 72:23, 73:7, 73:10, 73:12
**their's** [1] - 26:11
**theoretically** [2] - 46:19, 46:22
**theory** [2] - 31:17, 31:22
**therefore** [2] - 20:2, 43:12
**therein** [1] - 4:3
**they've** [1] - 56:3
**thin** [1] - 15:23
**thinking** [2] - 12:2, 13:8
**thinks** [1] - 68:1
**third** [13] - 7:11, 26:24, 27:1, 29:1, 34:23, 37:22, 38:25, 39:13, 39:14, 51:4, 51:8, 63:11, 70:14
**third-party** [1] - 7:11
**thoughts** [1] - 4:19
**thread** [1] - 41:10
**three** [6] - 16:9, 26:5, 26:12, 41:14, 45:12, 45:19
**throughout** [1] - 8:22
**thwart** [4] - 39:22, 39:25, 40:3, 42:16, 45:15, 45:21
**thwarting** [3] - 43:11, 44:2, 45:17
**timeframe** [1] - 9:2
**Title** [5] - 21:20, 22:10, 50:3, 50:4, 67:8
**title** [1] - 65:14
**TO** [1] - 1:5
**today** [3] - 9:17, 53:20, 58:23
**took** [4] - 7:7, 7:8, 16:2, 33:1

**tool** [1] - 35:4
**top** [1] - 20:12
**topic** [1] - 65:4
**topics** [1] - 65:4
**total** [1] - 42:7
**touched** [1] - 50:21
**tough** [3] - 45:8, 45:9, 48:9
**traction** [1] - 16:13
**trade** [4] - 24:13, 30:22, 64:8, 64:14
**transactions** [1] - 51:5
**TRANSCRIPT** [1] - 1:14
**transcript** [2] - 2:4, 52:14
**transcription** [1] - 2:4
**transfer** [2] - 71:3, 71:11, 71:24
**transitory** [1] - 66:18
**transmissions** [1] - 52:8
**transport** [2] - 70:23, 71:16
**trial** [3] - 7:17, 25:13, 29:20
**tried** [2] - 3:18, 56:18
**trouble** [1] - 61:1
**troubled** [1] - 53:25
**true** [2] - 42:19, 71:20
**trust** [7] - 59:5, 59:11, 60:18, 60:24, 61:3, 61:11, 61:14
**try** [2] - 44:19, 56:3
**trying** [13] - 26:7, 26:20, 36:16, 38:6, 40:20, 41:7, 45:6, 47:2, 47:5, 48:1, 56:17, 67:12, 72:11
**turn** [1] - 59:16
**turnaround** [1] - 7:22
**turned** [1] - 72:19
**turning** [2] - 6:8, 40:4
**twenty** [1] - 24:24
**two** [19] - 5:14, 6:6, 6:24, 7:19, 9:15, 21:8, 26:2, 26:15, 37:4, 45:10, 50:20, 54:14, 57:6, 61:17, 65:18, 66:1, 68:18, 70:10, 73:5
**type** [4] - 51:13, 54:22, 64:10, 67:4
**types** [7] - 52:9, 52:10, 53:13, 57:15, 64:25, 65:13, 69:9

**U**

**U.S** [1] - 35:5
**unable** [3] - 3:21, 6:10, 7:2
**unanimous** [1] - 17:15
**unanimously** [1] - 18:2
**under** [29] - 4:13, 17:20, 18:14, 21:8, 26:4, 26:13, 26:22, 27:17, 28:8, 30:2, 30:4, 30:6, 30:10, 31:3, 31:17, 31:22, 35:8, 38:8, 43:12, 43:18, 43:22, 53:5, 53:21, 54:16, 58:12, 66:18, 67:22, 69:14, 70:1
**undermine** [3] - 18:20, 18:23, 60:24
**underscore** [1] - 50:22
**undue** [1] - 20:3
**unfortunate** [1] - 9:20
**unfortunately** [1] - 64:19
**UNITED** [2] - 1:1, 1:15

**United** [10] - 1:10, 1:17, 2:16, 2:18, 3:13, 34:25, 40:17, 45:22, 49:6, 71:13
**unknown** [1] - 13:3
**unlawful** [1] - 28:3
**unless** [1] - 22:6
**unlock** [4] - 3:18, 3:21, 4:8, 51:13
**unlocked** [1] - 4:10
**unlocking** [1] - 67:6
**unnecessary** [1] - 19:22
**unrealistic** [2] - 35:10, 35:13
**unreasonable** [2] - 19:24, 26:18
**unwillingly** [1] - 59:25
**up** [10] - 20:6, 33:17, 50:11, 57:2, 67:17, 69:12, 70:22, 72:4, 72:8, 73:2
**update** [2] - 20:18, 67:13
**updated** [1] - 19:14
**updating** [1] - 9:1
**US** [2] - 1:21, 11:12
**usage** [1] - 37:4
**usages** [3] - 37:18, 37:25, 38:12
**useful** [1] - 13:2
**user** [3] - 17:25, 29:6, 42:6
**users'** [1] - 54:11
**uses** [2] - 30:18, 32:13
**utilities** [1] - 23:17

## V

**valid** [4] - 9:12, 10:10, 12:16, 39:1
**value** [4] - 11:25, 12:1, 12:2, 14:6
**values** [1] - 13:2
**variation** [1] - 17:12
**variety** [4] - 53:9, 58:12, 65:4
**various** [2] - 27:2, 73:2
**vast** [1] - 24:6
**vector** [1] - 58:21
**verification** [1] - 63:14
**Verizon** [2] - 21:8, 21:15
**version** [3] - 4:15, 4:17, 19:14
**versus** [8] - 27:10, 28:13, 30:2, 30:6, 31:3, 40:17, 45:22, 70:21
**video** [1] - 27:3
**view** [2] - 37:7, 65:16
**views** [4] - 55:16, 56:8, 59:19
**vindicate** [1] - 56:15
**voluntarily** [1] - 54:20
**voluntary** [1] - 57:5
**vote** [3] - 16:2, 18:8, 18:13
**voted** [4] - 15:19, 15:25, 16:4, 17:9
**voting** [1] - 18:4

## W

**wait** [1] - 36:9
**waited** [1] - 6:19
**waiver** [3] - 8:17, 8:19, 11:2
**walk** [2] - 29:21, 30:11
**wants** [4] - 5:1, 25:13, 53:13, 65:25

**warfare** [1] - 43:6
**Warrant** [1] - 2:11
**warrant** [30] - 5:10, 5:12, 5:15, 5:18, 6:3, 6:5, 6:8, 6:17, 7:5, 7:7, 7:10, 9:12, 10:11, 16:24, 19:20, 19:21, 29:12, 29:17, 31:14, 36:1, 39:1, 40:1, 42:13, 42:17, 42:23, 44:7, 44:13, 54:23, 61:23, 70:18
**WARRANT** [1] - 1:6
**warrants** [2] - 5:14, 39:12
**Washington** [1] - 1:23
**ways** [2] - 36:16, 54:14
**Wednesday** [3] - 73:6, 73:7, 73:9
**week** [1] - 18:13, 18:14
**weeks** [3] - 6:6, 7:19, 9:15
**weight** [2] - 55:12, 61:15
**welcome** [5] - 2:19, 10:12, 23:4, 23:21
**whole** [1] - 65:7
**wider** [2] - 53:9
**win** [1] - 56:3
**wipe** [5] - 32:17, 32:22, 32:23, 42:18, 72:13
**wire** [5] - 32:16, 49:13, 50:3, 50:4, 51:21
**wiretap** [1] - 21:20, 22:10
**wiretaps** [1] - 22:6
**withdraw** [1] - 44:20
**witness** [2] - 29:21, 31:22
**wonder** [1] - 37:6
**wonderful** [3] - 11:15, 45:4, 72:25
**wondering** [1] - 28:6
**words** [5] - 4:4, 37:4, 60:7, 66:17, 71:18
**works** [3] - 4:7, 4:13, 56:10
**world** [1] - 9:4
**worried** [1] - 66:12
**worse** [1] - 31:2
**worth** [1] - 8:20
**wrapping** [1] - 31:1
**writes** [1] - 3:24
**writing** [1] - 54:3
**Writs** [60] - 15:5, 15:13, 15:22, 16:17, 17:20, 18:14, 19:4, 19:8, 19:9, 20:24, 26:13, 26:17, 26:22, 27:14, 28:1, 28:5, 28:9, 29:17, 30:3, 30:7, 31:16, 31:18, 31:20, 34:14, 35:8, 36:14, 36:17, 36:21, 37:10, 39:3, 43:13, 43:19, 44:21, 45:11, 48:4, 48:11, 49:11, 49:18, 51:14, 53:12, 53:16, 53:22, 57:14, 57:17, 58:24, 60:21, 62:1, 64:4, 64:6, 65:7, 66:13, 66:18, 68:20, 69:7, 69:14, 69:15, 70:1, 70:8, 70:12

## X

**XXX** [1] - 55:21

## Y

**year** [3] - 3:13, 5:13, 6:3
**years** [5] - 9:14, 12:13, 20:15, 48:15
**YORK** [1] - 1:1
**York** [30] - 1:11, 2:2, 26:4, 26:19, 26:24, 27:1, 27:5, 27:8, 27:10, 27:20, 27:25, 28:13, 28:14, 39:17, 39:21, 40:13, 43:18, 43:24, 45:18, 45:22, 47:6, 47:17, 49:5, 49:16, 51:17, 51:20, 54:16, 67:22, 69:3, 71:8

## Z

**ZwillGen** [1] - 1:22
**ZWILLINGER** [44] - 1:24, 2:20, 10:23, 24:23, 25:6, 25:15, 32:20, 33:4, 50:19, 53:3, 53:7, 54:7, 54:13, 55:10, 56:5, 56:20, 57:13, 58:1, 58:9, 59:13, 60:2, 60:9, 60:19, 61:17, 62:14, 62:19, 62:22, 62:25, 63:10, 63:22, 64:7, 64:13, 64:20, 64:22, 66:19, 67:2, 67:16, 67:19, 68:10, 68:13, 69:11, 69:24, 73:9, 73:11
**Zwillinger** [1] - 2:21